# Wheeling.

## STATE *v.* STRAUDER.

### Decided November 17, 1877.

1. Taylor Strauder was indicted for murder in the circuit court of Ohio county, on the 20th day of May 1872, within one month after he was arrested. The case was continued several times upon his motion, but never on the motion of the State. He was tried and convicted at the July term, 1873. He then applied for and obtained a writ of error to the Supreme Court of Appeals. On the 20th day of July 1874 they reversed the judgment of the circuit court, sentencing him to be hanged, because the circuit court had refused to remand him to the county court for examination. On the 20th day of October, 1874, a new indictment was found against him, on which the State elected to try him; and thereupon the prisoner moved the court to discharge him from custody, three terms having elapsed since he was in custody upon the *mittimus* of the Justice issued on April 25, 1872. HELD:

    The circuit court properly overruled this motion.

2. A prisoner is not entitled to have a case removed into the Circuit Court of the United States for trial upon his petition, supported by affidavit setting forth that he is a colored man, and that such prejudices exist in the State against his race, that he cannot get justice in the State courts, and also that by a law of the State only white men can sit upon the jury.

3. In this State there are two modes of obtaining juries for the trial of felonies—one under the 3d section of chapter 47 of Acts 1872–3, the other under the 6th and succeeding sections of said act. If the record shows that the jury was summoned in the second of these modes, this Court will not reverse a judgment of the circuit court refusing to quash the *venire facias* or the panel of the jury, because it does not appear that all the provisions of the statute, other than those to be performed by the circuit court or its officers, have been complied with, it not appearing affirmatively that any of the provisions of the act have not been complied with.

94

1877.
Special Term.

4. Upon the trial of a prisoner charged with murder, after the jury had been examined on their *voir dire*, accepted and sworn, and after considerable testimony had been taken, the counsel for the prisoner placed in the hands of a Judge on the bench privately an affidavit of a person, that he had heard one of the jurors say, some three months before, that the prisoner ought to be hung; and also affidavits of the prisoner and his counsel, that they had just learned that the juror had expressed any opinion, or that he had any bias against the prisoner; but neither the prisoner nor his counsel made any motion based on said affidavits, nor does it appear, that the attorneys for the State had any knowledge of the existence of these affidavits, or of their being handed to the Judge. The court took no action upon them; and after the prisoner had been found guilty by the jury, the prisoner moved for a new trial, because this juror served on the jury; and thereupon the juror made his affidavit positively denying that he expressed such opinion to the party who made the affidavit, or to any one else; or that he entertained any prejudice or bias against the prisoner. And it does not appear that the prisoner suffered injustice by reason of this juror serving on the jury, the court below refused to grant the new trial. This Court will not reverse such a decision.

5. The court below properly rejected the following instruction: " If the jury entertain a rational doubt of the soundness of the mind of the prisoner, at the time of the commission of the homicide charged, he is entitled to the benefit of that doubt as he would be to the benefit of a doubt as to any other material fact in the case, it being under our statute a necessary ingredient of the offense, that the person charged shall, at the time of the commission of the offense, be of sound mind, although the jury may believe he had judgment and reason sufficient to discriminate between right and wrong in the ordinary affairs of life even at the time of the commission of the offense, they cannot find him guilty"—and properly gave the following instruction in lieu thereof: " To entitle the prisoner to an acquittal upon the ground that he was insane a$^t$ the time of the commission of the offense charged in the indictment, such insanity must be proved to the satisfaction of the jury, though in passing upon this question, they may look at the whole evidence in the case, as well that for the State as for the prisoner."

Taylor Strauder, a colored man, was convicted of the murder of his wife and sentenced to death by the circuit court of Ohio county on the 9th day of January 1875.

From this judgment of the circuit court a writ of error was awarded him to this Court. The facts of the case are stated in the opinion of the Court.

Hon. T. Melvin, Judge of the first judicial circuit, presided at the trial below.

*Davenport & Dovener*, for the prisoner:

The first question to be considered is, did the circuit court err in not discharging the defendant from custody upon his motion, it appearing to the court from the evidence in support of the motion that three terms of the circuit court had elapsed since the defendant was imprisoned? See Code, chapter 158, section 12, p. 715. The record shows that the indictment was found on the 20th day of October 1874, and the defendant was committed on the 25th day of April 1872, five terms of the circuit court having been held since his incarceration, and before the term at which said indictment was found. In *Adcock's case*, 8 Gratt. 661, one of the questions presented was, ought the court to discharge the prisoner, and to receive the record as evidence? The court held that the record was indispensable to prove the fact of indictment or trial, and that there could be no doubt of the necessity of adducing the record evidence. No such evidence was adduced in this issue by the State.

It was error in the circuit court to refuse to grant the defendant's petition to remove his cause to the Circuit Court of the United States for the fourth judicial circuit. In the case of the *Rathbone Oil Company* v. *Charles M. Rauch*, 5 W. Va. 79, this Court decided that it is error in a State court to refuse to certify a proper case to the United States court. That the petition and affidavit of defendant made a proper case for such removal, there can be no doubt. By the act of the Legislature, chapter 47, section 1, p. 102, Acts of 1872–3, passed March 12, 1873, in relation to juries: "All *white* male persons, who are twenty-one years of age and not over sixty, and

who are citizens of this State, shall be liable to serve as jurors, except as herein provided." The second section excepted State officials. This statute was, if of any validity, in force when the defendant was tried. On the 9th day of April 1866 Congress passed an act entitled, "An act to protect all persons in the United States in their civil rights, and furnish the means of their vindication." See 14 Statutes at Large, chapter 31, p. 27, sections 1 and 3. The first section of the act declares " all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, to be citizens of the United States;" and it enacted that such citizens of every *race* and *color*, shall have the same rights in every State and territory in the United States, to make and enforce contracts, to sue and be sued, be parties and give evidence, to inherit, lease, sell, hold and convey real and personal property, and to full and equal benefit of all *laws and proceedings for the security of persons and property as is* enjoyed by white *citizens*, and shall be subject to like punishment, pains and penalties, and to no other, any *law, statute, ordinance, regulation or custom to the contrary notwithstanding.*

Section 3 confers exclusive jurisdiction upon the courts of the United States of all cases, *civil and criminal, affecting persons*, who are *denied* or cannot enforce in the *State courts* any of the rights secured to them by section 1st, and provides for the removal from the State courts of such causes upon affidavit, &c. This act was passed in pursuance of the 5th section of the fourteenth amendment to the Constitution of the United States, which section provides that Congress shall have power to enforce by appropriate legislation the provisions of the fourteenth amendment. The purpose of that amendment and the reason for its adoption, are so well known, that it is entirely unnecessary to advert to them—all agreeing that the purpose of the amendment could not be more fully expressed than in the words of the section itself, which, after defining who are citizens, is in the

following words: "No State shall make any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

*1877.*
*Special Term.*

*State*
*v.*
*Strauder.*

The act known as the civil rights law has been decided to be constitutional in the case of the *United States* v. *John Roads et al.*, 1 Am. Law Times p. 23. This is the first reported case where the act received judicial construction. The court held that the civil rights law gave to colored persons everywhere the same right to testify "as is enjoyed by white citizens," and that the United States courts had jurisdiction of all cases, civil and criminal, which concern the colored man, wherever the right to testify equally with the white is denied him, or cannot be enforced by the State tribunals. The right to trial by jury is guaranteed to every citizen of the State of West Virginia by the Constitution of the State; but men of color are not permitted to be jurors. The convention that framed the Constitution, it is apparent from that instrument, intended that there should be no such distinction, from the fact that they permitted colored citizens to hold office. A colored man may be a *judge, clerk* or *sheriff*, but he *cannot* serve on a jury. Is not, it is submitted, the denial of a colored man the privilege of having one of his own color on a jury, or requiring him to select a jury of white men from a panel, made up by the law of the State exclusively of white men, and on which no colored man can sit, a denial of a *right which white men enjoy,* and a *distinction* in the selection of jurymen for the trial of his cause on account of *color?* The right of a trial by jury has been considered one of the most sacred a citizen enjoys, and the right to be tried by a jury of our peers, "a jury of the vicinage." These terms are intended to imply a jury of our class, our fellows, our neighbors, those who have interests in common with us, is the very essence of the jury system, see 1

Black. Com. a jury selected, summoned and impaneled in such manner as the laws of the State may direct, except that no distinction shall be made between citizens on account of "race, color or previous condition of servitude."

In Virginia, in former days, an *alien* was entitled to a jury, *de medietate linguœ*, 1 Rev. Code, p. 266. This was also the practice in New York and Pennsylvania, see Rob. (old) Pr. 3d vol. 152, and was the law of England. 27 Ed. III, c. 13.

It is not enough to say that the negro is our peer and then deprive him, by reason of his color, of all that protects him. The right to have his cause tried by his fellows, or under a law that does not discriminate against him, is a greater protection to his rights and liberty than the right to hold office.

Blackstone says that "the right to trial by jury or the country, *per patriam,* is a trial by the peers of every Englishman, and is the grand bulwark of his liberties, and is secured to him by the great charter." And again he says, "the truth of every allegation in an indictment should afterward be confirmed by the unanimous suffrage of twelve of his equals and neighbors, *indifferently* chosen and *superior to all suspicion.*"

In the case of *State* v. *Dunlap,* Am. Law Times R. 205, the supreme court of North Carolina held, that an affidavit by a colored man in a criminal cause pending in the State court, setting forth in substance, that by reason of his *color* and previous condition of servitude, he cannot obtain justice in the courts of the State, entitles him to have his cause removed into the United States court. It was decided, not because the laws of North Carolina made any distinction, (as in this State), but because the petitioner was a man of color, had been a slave, and the people of North Carolina were prejudiced against him for that reason.

In the *Slaughter House Cases,* 16 Wall. 27, the supreme court of the United States construed the thirteenth and fourteenth amendments to the Constitution of the United

States; but the question now under consideration was not decided. 16 Wall. 81. They however did construe the clause which forbids a State to deny to any person the equal protection of the laws; and decided that it was clearly intended to prevent the hostile discrimination against the negro race, so common in the states in which he had been a slave; and for this purpose the clause confers ample powers on Congress to secure his rights and his equality before the law. To the same effect is the case of *Bartemeyer* v. *State of Iowa*, 18 Wall. 129, which was considered by the court at the same time, but was not reported for some time afterward.

In the case of *State* v. *Gibson*, 36 Ind. 389—S. C. 10 Am. R. 42, the court decided, a State law forbidding the marriage contract to be entered into between the white and colored race, was not abrogated by the civil rights act, or the fourteenth amendment, this being clearly a state regulation, which could not in any way affect the rights of any person within the meaning of the act or the amendment, for the reason that no privilege is granted or denied the white, that is enjoyed or refused the colored race. *United States* v. *Reese*, Am. Law Times R., May 1876, 201, 202, 203; *United States* v. *Cruikshanks*, *Ib.* 211.

In *The Commonwealth* v. *Wash*, 16 Gratt. 537, 538, the court said : "The summoning officer has been required to exclude from the jury those, whom by law the prisoner was entitled to have as his triers. If the writ may thus limit the range of selection, the trial of offenses would thus be limited to such persons, as the clerk thought proper to designate. No such power has been entrusted to any such functionary, and not being authorized by law, the court erred in not granting the motion to quash."

The court should have quashed the *venire facias.*

1st. Because the same was not issued and returned according to law ; and second, because the same was not issued for the trial of the defendant's cause as required

1877.
Special Term.

State
v.
Strauder.

by law.   See section 3 of chapter 47 of the Acts of 1873, entitled, "an act to amend and re-enact chapter 116 of the Code, and an act amendatory thereto," requires that "if a case of felony be for trial in a circuit court, the clerk thereof shall issue a *venire facias* to the sheriff of the county, commanding him to summon twenty-four qualified jurors to attend the said court, on the *first day of the term, &c.*

The act repealed and amended all existing acts in force with reference to juries, and the *venire facias* should have been issued in conformity with its provisions.   See *Perry's case*, 3d Gratt. 632.   By reference to the record it will be seen, that the sheriff's return is incorrect, and not in conformity with the latter clause of section 14 of chapter 47, Acts of 1873, in this, that the clause referred to requires, that "a due return thereof," and of the summons aforesaid shall be made to such court at the opening thereof."

By the act of the Legislature, 1873, page 113, the first day of the term of court began on the 5th day of November 1874.   The court should quash the *venire*, because the same was not issued for the trial of the defendant's cause, but for causes generally.   See 3 Rob. Pr. (old) 150; *Commonwealth* v. *Leaths et al.*, 1 Va. Cas. 151; *Gardner* v. *Turner*, 9 Johns. 261.   In this case, the court held that a challenge to the array for any partiality or default in the clerk in selecting and arraigning the jury was a good cause of challenge.   The defendant took advantage by challenge to the array, as well as by motion to quash the *venire*.

By the adoption of the third section of the jury law the old law of Virginia, in reference to issuing and returning *venire facias*, was re-established.   It was always the practice to issue a separate *venire* for each cause.   *Perry* v. *Commonwealth*, 3 Gratt. 632.

3d.   For the reasons set forth herein, with reference to certifying case to the Federal court: *Com.* v. *Wash*, 16 Gratt. 537-8: *McWhirt's Case*, 3 Gratt. 594.

The court should have sustained the challenge to the array of the panel, for the same reason given herein for quashing the *venire*.

It was error in the court not to have withdrawn the juror Larkin. He was undoubtedly incompetent; and the defendant had used every means in his power to obtain a fair and impartial jury. He could not waive a constitutional right.

In *Schumaker* v. *State*, 5 Wis. 324, the court held, that in a capital case, where the defendant is presumed to stand upon all his rights and to waive nothing, an objection to the competency of a juror will be allowed after verdict, where the fact of such incompetency was unknown before: *State* v. *Cole*, 17 Wis. 674, is to the same effect: *The People* v. *Guykowski*, 2 Ill. 476; *State* v. *Babcock*, 1 Conn. 401; *Borst* v. *Beecker*, 6 John. 332.

This has been in Virginia: *Cherry's Case*, 2 Va. Cas. 20; *Shaw* v. *Blank*, 3 H. & McH. 101; 13 Smede & Marsh. 286, 289.

In the case of *The Commonwealth* v. *Dilworth*, 12 Gratt. 689, 693, the court of appeals decides that the disabilities created by statutes, do not refer to other causes of challenge which exist at common law, and as to which the statutes are silent. Prejudice being a cause of challenge at common law, it is from the authorities referred to respectfully submitted, that section 24 of chapter 47, of the Acts 1872-3, is inapplicable. Our statute is in the identical language of section 4 of chapter 162, of Code of 1849, 628. The attention of the Court is particularly called to the opinion of Judge Daniels, on page 693, where he most conclusively shows that all the cases, which are in conflict with the proposition, that the exception can avail after verdict has been decided under circumstances peculiar to themselves, as that the defendant knowing the disability, or that there was no affidavit of the defendant. In one case the court did not believe the affidavit, as it was confined to recollection, and it appeared that he might have known; in another case, it was proven by

the State that the defendant did know.   The learned judge then adds, that the inference to be drawn from these cases is strong; if the defendant did not know the disability, the decision would have been different.    The opinion of so great and learned a judge upon this question, and that the defendant did not know of the disability, must have weight with the court.   As to waiver of a right in a capital cause, the Court is referred to the able opinion of the court of appeals of New York, in the case of *The People* v. *Cancemi*, 18 N. Y. R. 129.   The accused was tried and convicted of murder in the ·first degree.   After the trial had commenced and progressed for some time, at the instance of the prisoner, and with his consent in writing, which was made a part of the record, one of the jurors was withdrawn, and the trial proceeded with the remaining eleven, who returned a verdict of murder in the first degree, and the sentence of death was pronounced against the prisoner.   The case was taken by appeal from the supreme court to the court of appeals, and one of the most important questions raised and considered was : whether it was competent for the prisoner to waive, as he had attempted to do, his right to be tried by a legal jury, consisting, according to the common law, of twelve men.

On behalf of the people, it was insisted that the prisoner had a clear right to waive his privilege of being tried by a legal jury, and having done so, expressly and voluntarily, he was precluded from making the objection in the appellate court.    But the court ruled otherwise, and held that the right of the prisoner, to be tried by a full jury of twelve persons, was a constitutional right which could not be waived, and that his consent to do so was a nullity, and conviction was illegal; and the general proposition was strongly maintained, that in criminal cases the constitutional rights of the accused cannot be waived by him, nor be disregarded by the court.

Was it error in the court to refuse to set aside the ver-

dict and grant a new trial on account of the bias and prejudice of juror Ed. Larkin, the affidavits of the prisoner, and of his counsel who tried the cause showing the fact that they had no knowledge of the facts stated in the affidavits of J. A. Robinson? All of the jurors in this cause were challenged for principal cause, the court putting all the questions to them in relation to statutory disqualifications and only those standing fair were elected. In the state of New York, on a trial in the circuit court for murder, a juror being challenged for principal cause, stated, that the opinion he had formed was not so fixed that it might not be controlled by the evidence, and the juror was found indifferent and sworn; but the court of appeals *held otherwise.* The latter court, per Strong, Judge, said:

"*The right secured by law to a fair and impartial jury, with minds open to receive and weigh the evidence, and balanced with regard to the matters to be tried, is of the highest importance, and should be carefully guarded by the courts, especially in cases involving human life. In our opinion, the juror was clearly disqualified. His mind was preoccupied with an opinion upon the issues to be tried, which would require evidence to remove, and upon that principle, and by all the cases, incapacitating him as a juror.*" See *Cancemi* v. *The People,* 2 Smith, N. Y. 501.

In Virginia, after a verdict of guilty in a capital case, the prisoner offered testimony that two of the jurors who tried the case, and who on their *voir dire* declared, that they had not formed or expressed an opinion as to the guilt or innocence of the prisoner, had in fact, previous to the trial, expressed decided opinions that the prisoner was guilty, and *ought to be hung,* of which circumstance, the prisoner alleged that he had no knowledge until after the verdict was rendered; and on this ground he moved for a new trial. Held that the inquiry was open, and the evidence admissible, for the purpose of showing perjury, and corruption in the jurors: see *Heath's case,* 1 Rob. 735.

1877.
Special Term.

State
v.
Strauder.

To the same effect, are the cases reported in 11 Leigh 657, 662; 3 Dallas 513; *Bussvick* v. *State*, 19 Ohio 198; 13 S. & M. 189; 5 Geo. 85; 3 Bibb. 347.

The exception, mentioned in the 25th section of the jury act, can have no bearing, as the same provision existed when *Dilworth's case*, 12 Gratt. 689, was decided: Acts W. Va. 1873, p. 108; Acts of Va. 1852-3, p. 44; Code 1860, p. 69; 2 Whart. Am. C. L., §3,153; *Sellers* v. *The People*, 4 Ill. 412; *United States* v. *Fries*, 4 Dallas 515; 37 Mo. 343.

That the verdict was contrary to the law and the evidence is apparent. It will appear from the statement of facts in the record, that the defendant went to his house late at night, found a white man with his wife, who escaped; that he accused her of adultery, which she admitted, and that the prisoner instantly struck her; that he struck the deceased with a hatchet, which was in the room at the time, and usually kept there. There was no evidence of any previous malice. This is not murder in the first degree: 4 Black. Com. 193, 200; 5 Burr. 2,794; 2 Chit. C. L., 484; *Stevens* v. *State*, 3 Am. L. T. R., 262; *Sickles's case*, and cases cited.

The court erred in refusing the instructions asked for by the defendant, and in giving the instructions given by the court: see record, page 20; *People* v. *McCann*, 16 N. Y. 58: 28 Ala. 692; 19 Ind. 170; 31 Ill. 385; *People* v. *Garbutt*, 7 Am. L. Reg. (N. S.) 555.

The court should not have permitted the witness, Gillespie, to testify to the contents of the warrant and affidavit, which were introduced to show previous threats: Record, page 46.

The court should have permitted the evidence, ruled out on page 57 of the record, to have been given.

The court should have granted the defendant a new trial, for the reasons set forth in bill of exceptions number seven.

The importance of a new trial is expressed in no case more properly than in the case of *Truelock* v. *The State*,

1 Clark, Iowa Rep. 515, in which the court says: although no one thing, that has transpired, amounts to error in law, yet if the court, in considering the whole case, and in viewing it in its most equitable aspect, is satisfied that the prisoner, without any fault on his part, has not had a full and impartial hearing, it will grant a new trial.

*Attorney-General*, for the State:

The first exception, appearing in the record in this case, is the one found on page 11 of the printed record, and was taken because the court below refused to discharge the prisoner from custody, on his motion, "because the said indictment had not been found before the end of the second term after he was in custody."

The statute upon which the prisoner relied in making this motion, is that found on page 715, section 12 of the Code, the language of which is as follows, viz:

"A *person in jail*, on a criminal *charge*, shall be discharged from imprisonment, if *he be not indicted* before the end of the second term of the court, *at which he is held to answer*, unless it appear to the court that material witnesses for the State have been enticed or *kept* away, or are *prevented* from attendance by sickness or *inevitable accident*," &c.

The *mittimus* of a justice, dated 25th April 1872, commanding a constable to deliver the prisoner to the jail, he being "*charged*" with murder, and commanding the jailer to receive him into jail and custody, "that he may be examined for the said offense by me (the justice) on the 26*th day of April* 1872, at my office in the township of Madison, said county, and him there safely keep, unless he shall be discharged by due course of law," is the only evidence submitted with the exception, in the printed record, tending to show that the prisoner ever was in custody until after the indictment found on 20th October 1874.

The printed record shows that after he was indicted on 20th October 1874, he was led to the bar in custody of the jailer.

It will be observed, that a prisoner, to be discharged under and by virtue of that statute, must be in jail and held there to *answer at a term* of court.

By the *mittimus* given, it will be seen, that he was thereby held only for *examination* by the said *justice,* and not to answer an indictment or otherwise at a *term* of court.

It will be observed again by reference to the statute, that a prisoner shall be discharged, *if he is not indicted* before the end of the second term, at which he is held to answer. Here no motion was made for his discharge before he was indicted ; but *he had been indicted* before the motion was made.

Attention is also called to the words " criminal charge," which are to be taken in their ordinary meaning as contra-distinguished from the word " indictment."

It is therefore submitted that said statute only contemplates the discharge of a prisoner when held in custody under some *criminal charge.* It cannot mean that an indictment, when found, cannot be tried, because found after two terms of a court have elapsed, and without the prisoner's having, before the indictment, moved for discharge for want of it. It cannot mean that a prisoner held in custody, *under an indictment,* for *trial,* must be discharged *without* such trial.

Section 1, chapter 158, page 713 of the Code, provides that an " indictment may be found in the first instance." Suppose a case where an indictment had been found, and the prisoner was held under it, for two terms, could he be discharged ? No—unless under and by virtue alone of section 25 of chapter 160, page 721, of the Code, and indeed, in this case, it will appear, by an examination of the record once before the court, upon a former indictment, for the same offense, that the prisoner was actually

held under such former indictment, and held in custody too, by his own act and at his own instance.

If the indictment found on the 20th day of October 1875, and found upon page 6 of the printed record, is to be considered as a *new indictment*, separate and distinct from any other indictment or proceeding in court against the prisoner for the offense of murder named in it; (and it seems the purpose of prisoner's counsel that it should be so considered), or in other words, if it is claimed that *this* case has never been in the Appellate Court before, then what is there, any where in the record as printed, which tends to show that the prisoner was ever " held" in custody prior to said 20th day of October 1874, "to answer" at *that* or any other term of Court. Is there anything at all, to show that he was in custody to answer said indictment, or to answer at said term of court. The only evidence of his being in custody, if the proceedings under the new indictment are to be considered as *distinct* from any other proceedings, is that the printed record, on page 8, shows that on the 2*d day of November* 1874, Taylor Strauder, "*who stands indicted,* was led to the bar in custody," &c.

But to take the other view of the matter:

The bill of exceptions number one sets out the fact, that the prisoner called upon the State to *elect,* whether he should be tried upon said indictment found at October term 1874, or upon one found at May term 1872.

This is the only evidence found *in the printed record,* if evidence it can be called in any sense, that there ever was another indictment against him. Care seems to have been taken, although it was considered necessary in the preparation of the exception to refer to an indictment of May term 1872, to keep it, as well as the proceedings under it, out from this record; and it is submitted, that if it is to be considered as necessary at all to refer to such an indictment, it may, as well as the proceedings of the court under it, be brought before the Court by *certiorari* or otherwise.

The said bill of exceptions contains the orders of the circuit court, showing when the terms commenced, and when they ended, from May 20, 1872, to Sept. 5, 1874, inclusive.

It is found from an inspection of the records of said court, at the terms named, that at the first term the case was continued upon the application of the prisoner; that at the second term named it was likewise continued; and that at the third term there was a motion to remand to the county court made by prisoner and overruled, a trial with exceptions taken by prisoner, verdict and judgment, with the other exceptions taken by the prisoner; and also that at the two next terms, the case was pending before the Court of Appeals, upon the exception taken by the prisoner. These matters are not made part of this printed record; and so far as they may be necessary to a proper understanding and decision of the case, I suggest them, and ask that they may be brought before the Court by *certiorari* or otherwise.

Section 6, chapter 17, Acts 1872-3, page 58, provides, "that when a case has before been in the Appellate Court, there shall only be copied the proceedings subsequent to the former trial, writ of error or *supersedeas*." And section 7 provides, "that the Appellate Court, or the Judge thereof may, when a case has before been in such Court, inspect the records upon the former appeal, writ of error or *supersedeas*."

As has been seen, the said bill of exceptions *refers* to a former indictment against the prisoner for the same offense, as well as sets out the *mittimus* referred to, and *that far* seeks to use the record and proceedings referred to, in order thus to obtain his discharge if possible.

The record of the Court of Appeals shows the fact, that the prisoner was indicted at the May term 1872, of the circuit court of Ohio county, for the same offense named in the indictment of the October term 1874; that he was tried and convicted, and brought the case to the Court of Appeals upon his own motion; that the verdict

and sentence of the court below was set aside, and the prisoner was remanded by the Court of Appeals, to the county court for examination under a statute then in force.

Now one of two things is true: this case has been in the Court of Appeals before or it has not. If not, then the reference to it in said exception is improper and ought not to be permitted to be used by the prisoner to obtain his release. If the case has been in this Court, then the Court should " inspect" the former " record," and should by its *certiorari* bring into the case all the proceedings in the circuit court below, as well as the proceedings of the county court, acting under *its orders.*

It is asked especially, that the records and proceedings of the examining court (the county court of Ohio county), which remanded the prisoner for trial before the circuit court, may be required, by proper writ to be certified to this Court, in order not only that the whole case should be before the court, but also that it may thus appear, that when said indictment of October term 1874 was found, the prisoner was in fact indicted " before the end of the second term of the Court, at which he was " *thereby held to answer.*

*Adcock's case,* 8 Gratt. 661, is referred to in the brief of the prisoner's counsel. *There* the court held that the record was the only competent evidence of the former trial and conviction (the verdict having been set aside).

It is submitted, that if any *part* of the former record is relied upon, the court should have it all before it.

It is shown that, if the former record is not to be considered as before the court, the prisoner is not entitled to his discharge. If now the former record *is to be considered,* how stands the case?

1st. It is thereby shown, that he made no motion for his discharge *before indictment* found.

2d. It is shown, that he was, in fact, indicted before the end of the second term of the court, after he was in custody.

96

3d. It is shown, that the second indictment was, in fact, found " before the end of the second term of the court, at which he *was held to answer* " by the examining court, which *remanded* him to the circuit court for trial.

4th. That, by the decision of *this* Court, *the examining court could only, by law,* have the authority to *hold him to answer* at a term of the circuit court.

It is not shown, that it did not appear to the court, that material witnesses were kept away or prevented from attending.

. It is further shown, that it was by the act of the prisoner himself, that the indictment of October term 1872 was delayed.

It is further shown, that the indictment of 1874, and that of 1872, are the same in substance and in fact; that the one of 1874 is a good indictment in law, this Court having decided that of 1872 to be good on demurrer; and that the prisoner is in nowise injured by being tried under the second indictment, rather than under the other.

Can it be possible, that it is to be held as law in West Virginia, that a man can be indicted for the gravest crime known to the law, and that, whilst that indictment is pending, the Legislature enacts a law which he may take advantage of, if he so desires, and use as a means of protection, if not of escape ; that he asks its protection, the courts give it to him, and then after, at his own request all that time, all these opportunities are given, he is to be discharged, because he asks and receives these advantages ?

Would it not be enacting a solemn farce, in the name of the law, thus to hold?  Public safety demands the punishment of the guilty, and public safety would be mocked, if it is law, that a man can claim the benefit of his own acts, his own delays, for his release.

The language of the learned Judge who delivered the opinion of the court in the case referred to (*Adcock's case,* 8 Gratt. 683, 684, &c.) in many instances most aptly ap-

plies in this case ; and if this Court holds that the prisoner is entitled to his discharge, would it not be an opinion, " whereby the law is rendered not only grossly defective and palpably absurd, but productive of the *practical mischief* of operating the acquittal and discharge from prosecution of atrocious offenders against the law?" See 8 Gratt. 675, 676.

The attention of the Court is called to the whole case of *Adcock*, and to the authorities therein referred to.

Prisoner's *second* exception will be considered hereafter.

As to the *third* exception :

The proposition laid down in *Perry's case*, that the mode prescribed by the law, at the time of trial, for summoning and making up juries, applies at such trial, is not disputed.

By reference to this exception it will be seen, that in it there is nothing to negative the fact, that the county court had not adopted " another mode of summoning juries for the trial of *criminal causes*," than that named in the third (3d) section of chapter 47, Acts 1872-3. By the sixth (6th) section of that chapter, the court had the power to adopt some other mode; and the exception shows, upon its face, that such other mode as is provided for in said sixth section, was pursued. Jurors were drawn —see sections 7, 8, 9 and 10—a writ of *venire facias* was issued for *thirty* jurors—see section 11—(not for *twenty-four* jurors, under section 3), the list was placed in sheriff's hands, who summoned twenty-eight of the number, and left two not summoned, because he could not find them.

Does the prisoner's counsel mean to object, because the sheriff did not execute the writ on *two* of the number? If so, the answer is simple; the law is merely *directory;* it does not require impossibilities ; could he, for instance, have served it upon a dead man, or a man then out of his bailiwick ? See *Wash's case*, 16 Gratt. 530.

The counsel, in his brief, cannot mean to endeavor to

induce the court to believe that the "return is incorrect," and not in conformity with the statute, which requires that "the return of the summons aforesaid shall be made to such court at the opening thereof," by calling attention to Act of 1872-3, page 113, by which the first term of the Ohio county circuit court was fixed to begin on the first Monday in November. I take it for granted he must have known, that by an Act, subsequent to the one referred to, an Act approved December 23, 1873, chapter 172, Acts 1872-3, the term of that court was thereby fixed to commence on the *third Monday in October.*

The record does not show, that the *venire facias* was, in this case, issued under the said third section of the jury act of 1872-3, but, as has been seen, the provisions of sections six &c. were carried out.

But the prisoner's counsel seem to insist, that the said third section was the only law, under which a *venire facias* could issue to try a case of felony.

For the sake of the argument admit it; and is there then error?

It is claimed that the *venire facias* does not show upon its face, that it was issued for the *trial of the defendant's case;* and that therefore it should be quashed.

The case referred to, *Com.* v. *Leath,* 1 Vir. Cas. 155, decides mainly, that if a prisoner has, by any *illegal means,* been deprived of his *right to elect* at his trial the persons returned upon the *venire,* the court should set aside the verdict, &c.

Has the prisoner been deprived of any *right* he had by any illegal means?

The said section *three* does not, upon its face, require that the persons named in the writ shall be summoned to try a *particular* case; but the language is general, and it means, if the court has a felony case before it for trial, then (if that *mode* alone is taken to obtain a jury), the writ shall command, that twenty-four men shall be summoned to attend on the first day of the term, *which jury the court may at any time discharge.*

Attention is called to chapter 229, Acts 1872-3, p. 727.

That act points out how, "in case of a felony," the jury for the trial is to be obtained ; and no complaint is made by the prisoner, that he was in any way *deprived of his right* to elect, which the law thus gave him.

Prisoner's counsel call the court's attention to *Com.* v. *Wash,* 16 Gratt. 537-8 ; and *McWhirt's case,* 3 Gratt. 594.

In the *Wash* case there was *apparent error on the face of the writ itself.*

But where is any such apparent error upon the *venire facias* in this case ?

By an examination of the *McWhirt case,* the court will see that the statutes, with reference to the *venire,* were · far different from the one now under consideration, and will find that there was a positive requirement to summon a *venire* in *each particular* felony sent on to be tried, in the then superior court of law.

Again, if the law intended that men were to be summoned to try a particular case, would the same law put the whole subject into the hands of the court to exercise its *discretion* to discharge *those men?* Then can it be said that *any right* of the prisoner has been taken away from him by illegal means? *Leath's case,* 1 Va. Cas. 155, before referred to.

The attention of the court is called to the 24th and 25th sections of Acts 1872-3, p. 108 : the jury law.

It is submitted that there was no *"irregularity"* in the *venire facias,* &c., or even if there was, it was not sufficient "to set aside a verdict." See also, *Bristow's case,* 15 Gratt. 646 to 652, inclusive.

It is submitted again, with reference to the challenge of the array of the panel, that there · is nothing in the exception, even if it had been made in time.

The ground of challenge set out in the exception number four, is:

1st. That the panel *was not summoned* according to law.

What has been said is an answer to this objection.

Besides this, the court of appeals of Virginia, in said case of Bristow, 15 Gratt. 651–2, distinctly says, that if the objection to the mode of selecting the jury was valid, " the prisoner, having failed to make it at the time the jury was chosen, could not avail himself of it after verdict."

2d. That there was no proper *venire facias* issued.

This objection is heretofore answered.

3d. Because the law, under which the said jury was impaneled, is unconstitutional and void, because the defendant is a colored man.

The question as to the constitutionality of the jury act, which the prisoner attempts to raise by this exception, as well as by exception number three, will be discussed when I come to consider exception number two.

Exception number five.

It seems from this exception that, after the jury had been examined upon their *voir dire* and sworn, and the trial was far advanced, the prisoner's counsel, in a low tone of voice, said to the judge presiding at the trial, that information had been received that Larkin, a juror, had expressed an opinion adverse to the prisoner, and showed the judge, and left upon his table, the affidavits of Robinson and the prisoner, given in the exception; but it *nowhere appears* that the judge read those affidavits, or that they were read to him, or that their contents were in any way made known to him.

But it does appear, that the trial proceeded with nothing further said, and *without any motion being made* in any way founded upon the said affidavits, nor were they attempted to be used in the cause until *after verdict*, and upon a motion for a new trial.

The prisoner knew of the alleged prejudice of the juror during the trial, yet no challenge was made during the trial, of the particular juror.

Such a challenge the prisoner could have made, and the court would have been bound to have exercised a sound judicial discretion about it. This was so under the law in Virginia, as it existed under the Code of

1849, page 628, section 4, which it will be noticed is the same as section 24 of chapter 47 of Acts of 1872–3, except that to this last section is added the words "unless by leave of the court." Clearly then under the law now, such a challenge could have been made; and it could have been made under the law as it was in Code of 1849. See *Jones's case,* 1 Leigh, 598; also, *Tool's case,* 11 Leigh 714, as well as *Dilworth's case,* 12 Gratt. to which prisoner's counsel refers.

The question here presented is a far different one from that presented in the cases above quoted. In those cases and in the *Dilworth case,* the question presented arose when the prisoner *did not know* of the disability (or prejudice or cause of challenge) at the time the *juror was sworn,* but ascertained the *fact during the trial,* and made his exceptions to the juror during the trial, which was decided against him.

The question *in this case* is far different; it is whether, when the prisoner knew *during* the *trial* of *cause of exceptions,* and did not take advantage of it, or challenge the juror *before verdict,* he could go on with the trial, hoping for a verdict from the then impaneled jury, and when disappointed in the verdict, use that supposed *known cause* to him, as a ground for setting aside the verdict.

The cases quoted, it is submitted hold no such doctrine.

In the case of *Boist* v. *Beecker.* 6 John. 332, the exception that the juror was an *alien,* was taken *before* verdict. So also in the Virginia case of *Com.* v. *Cherry,* 2 Va. Cases, 20. So also in the *Dilworth case,* 12 Gratt.; so also in the *Tool case,* in 11 Leigh.

Can a case be found where the verdict has been disturbed for any such cause, unless it appeared not only to have operated to the injury of the prisoner, but was also utterly *unknown to him until after verdict?*

The court in the *Dilworth case* says, that "the principles, to be deduced from the modern decisions, justify an indulgence to motions to set aside jurors after they

have been sworn, and before they have rendered a verdict, which would not be allowed to applications for new trials, founded on exceptions to jurors taken after verdict."

In *Bristow's case*, 15 Gratt. 634, the court refused to set aside the verdict, because one of the jurors was one of the grand jury : see case.

In case of *State* v. *Quarrell*, 2 Bay's R. 151, the court refused to set aside the verdict on the ground that the juror was an *alien*. So in the case of *State* v. *Driscoll*, 2 Bay's R., and *State* v. *Bigelow*, 2 Black R. 114, and a like decision in 2 Conn. R. 87.

In the case, *State* v. *Gillespie, &c.*, 8 Yerg. R. 507, the court distinctly holds, that if the fact of a juror having been upon the grand jury was *known* to prisoner before verdict, it was *no ground for a new trial*.

In the case of *Q. Bank* v. *Leavens*, 2 Conn. R. 87, the court distinctly recognized the rule forbidding a new trial for *extrinsic* causes, when known to the petitioner before verdict.

By examination of the following cases, it will be seen that the *cause* presented *was not known until after verdict*, viz:

*Herndon* v. *Bradshaw*, 4 Bibb's R. 45 ; *Page* v. *C. V. R. R.*, 1 Foster R. 488 ; the cases of *Jones* v. *C. W.*, 1 Leigh 598 ; *Heath* v. *Same*, 1 Rob. R. 735 ; *Hailstock's case*, 2 Gratt. 564, and *Curran's case*, 7 Gratt. 619, tend to establish the principle contended for. See also Judge Daniels, in the *Dilworth case*, on page 699 of 12 Gratt., *et sequitur*.

*Heath's case*, 1 Rob. R. 735, before referred to, is relied upon by prisoner's counsel.

In that case, it will be seen the prisoner *had no knowledge* of the bias of the juror, *until* after verdict.

Besides all this, the affidavit of the juror, Larkin himself, is filed, and with it before the court, and with the light of the authorities quoted before, could the "court be justified" in indulging a motion for a new trial ?

Could the court below have held otherwise, if the

juror Larkin had been challenged for the cause as set forth in the affidavits before it, than that Larkin was a competent juror?  I think not.

*Sprouce's case,* 2 V. C. 375; *Epes's case,* 5 Gratt. 678; *Pollard's case,* 5 Rand. 659; 2 Leigh 769; 6 Rand. 708; 3 Leigh 780; 9 Leigh 651; 9 Leigh 661; 2 Rob. R. 771; 6 Gratt. 696; 7 Gratt. 593; 8 Gratt. 606–7; 10 Gratt. 686–7; 10 Gratt. 658; 10 Gratt. 687; 7 Gratt. 619; 2 V. C. 6; 2 Gratt. 564; 4 B. and Ald. 492; and 2 Hawk. ch. 43, §28.

Other later cases can be named, if desired.

The action of the court below, as shown in the prisoner's bill of exception number six, will be found to be fully sustained by the court of appeals of Virginia, in the case of *Boswell* v. *Commonwealth,* 20 Gratt. 860, for which decision this Court, I doubt not, will have the highest respect.

It is submitted that the exceptions as taken, when they simply show in a general way, that an objection or motion was made without giving the grounds for objection or reasons for the motion, ought not to be considered; or in other words, that the court below is not bound to consider an objection without being advised of its character.

The question sought to be raised by the bills of exceptions, as to the constitutionality of the jury law of the State, can, I think, be best discussed in connection with the point raised by the motion of the prisoner, to remove the case to the United States Circuit Court, which motion and the reasons therefor, are set out in bill of exceptions No. 2.

And before proceeding further, I remark that the Court should hesitate before pronouncing any law unconstitutional, and refer the Court to the rules and principles governing this subject, as laid down in the able opinions in the cases of *Bridges* v. *Shallcross,* and *Jacob,* &c., v. *Slack,* &c., decided by this Court.

97

Without entering into the question of the constitutionality of the act of Congress, known as the "Civil Rights Bill," and more particularly of the acts providing for the *enforcement*, in the courts of the United States, of the *rights* sought to be guarranteed by that law, it is suggested to the Court, whether the provisions of the latter acts are not *so general* in their terms, especially in so far as it effects the question sought to be raised by the prisoner's exception No. 2, that they cannot be regarded as appropriate legislation for the enforcement of the fourteenth amendment of the Constitution of the United States; and in this connection, the attention of the Court is called to the case of *United States* v. *Reese*, &c., referred to by defendant's counsel, and reported in 2 Otto 214.

The act of Congress, referred to in counsel's brief, which was passed on the 9th of April 1866 (14 stat. ch. 31, p. 27) is not the act of Congress, which was in force at the time of the trial of this case below.

The act then in force, known as the "Civil Rights Bill," may be found in the Revised Statutes of the United States, page 348; and it provides that "all persons within the jurisdiction of the United States shall have the same *rights* in every State and Territory, to make and enforce contracts, to sue, be parties, *give evidence*, and to the full and *equal* benefit of all laws and proceedings for the security of persons and property, *as is enjoyed by white citizens*" &c. And then in the succeeding section follow certain *laws* providing for the protection of persons in the "equal civil rights of citizens."

By reference to section 641 of a judiciary act, page 114 of the Revised Statutes of the United States, the court will find the provisions for the "removal of causes against persons denied civil rights." That section in effect provides that "when any civil suit or criminal prosecution is commenced in any state court, for any cause whatsoever, against any person who is *denied*, or

*cannot enforce* in the " state tribunals *any right* secured to him by *any law providing for the equal* civil rights of citizens of the United States," " such suit or prosecution *may*, upon the petition of such defendant, filed in said State court, at any time before the trial or final hearing of the cause, *stating the facts*, and verified by oath, be removed for trial into the next Circuit Court; and it then substantially provides *how* the defendant may proceed to get the case tried in such Circuit Court of the United States.

Waiving the question, which suggests itself upon reading that section, as to whether the defendant's bill of exceptions sets forth enough to show, that he has made such demands under the law, as would entitle him to have his case placed upon the docket of the United States Court and then tried, let us see whether this case is one, which comes within the provisions of said statutes.

The Civil Rights Bill referred to, it is seen, provides that all persons shall have the same *right* to make contracts, &c., and to the full enjoyment and *equal* benefit of all laws, &c.   The said 641st section of the judiciary act provides for the removal from the State courts of cases of such persons, as are *denied* or *cannot enforce* in the State courts any *right* secured to them by *any law* providing for the *equal* civil rights *of citizens of the United States.*

Where then is there *any act or law*, providing for the civil rights of citizens of the United States, which gives them the *right of trial by* a jury of their own color, or of their own sex, or of persons of a certain age, or of any peculiar condition or qualification.   The only *right* of trial by jury, *belonging to citizens of the United States*, indicted for crime, is not that "sacred *right* secured to Englishmen by the great charter," but *is that* right provided for in the *sixth* article of the Constitution of the United States, which says: that " in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial

by an impartial jury *of the State* and district wherein the crime shall have been committed," &c.

Has this *right* been *denied* to the prisoner? Has he not been tried by a *jury of the State*, wherein the crime was committed?

*The Slaughter House Cases*, 16 Wall. 37, distinctly hold, that the second clause of the 14th amendment to the Constitution, protects from the hostile legislation of the States, the *privileges* and *immunities* of *citizens of the United States*, as distinguished from the privileges and immunities of citizens of the States.

The clause referred to, and quoted in defendant's brief viz: "No State shall make or enforce any law, which shall abridge the privileges or immunities of citizens of the United States," was again considered by the United States Supreme Court in the case of *State* v. *Bradwell*, 16 Wall. 130, in which case the Court says: "The protection designed by that clause, as has been repeatedly held, has no application to a citizen of the State, whose laws are complained of."

And in that case, the Court goes so far as to hold, that there are certain *privileges and immunities*, that belong to a citizen of the State, as such, which do not depend on citizenship of the United States, which the State is not forbidden to abridge: as in *that* case the right to practice the profession of law in the State courts.

As has been shown, every citizen of the United States, who is indicted for crime, has, by the Constitution, the right of trial by jury, but only the right of trial by a *jury of the State* and district, wherein the crime is committed.

The law here violated *is a State law:* the prisoner a *citizen* of the State : the jury a jury of the State, formed under its laws. As is seen in the *Bardwell case, it is the laws of the State of which he is a citizen, that* he complains of; and the said clause of the Constitution upon which he relies has (see *Bardwell's case*, aforesaid) no application to his case.

Where, then, is there "*any law*, providing for the equal civil rights of citizens of the United States, which has been violated by the court below? Where has any *right*, secured by any *such law*, been *denied* to the prisoner?

In the case of *United States* v. *Rhodes, &c.*, 1 Am. L. T. R. 22 (1868), upon which defendant's counsel seem so confidently to rely, the court says, on p. 24: "It will be observed that jurisdiction is given to this court of all causes, civil and criminal, affecting persons, who are denied, or cannot enforce in the local State courts any of the *rights*, secured by the first section of this act;" and on page 32 the court says, that the act "gives only certain civil rights;" and it is held that the right to "*give evidence*" is a *right conferred by the law* upon colored as well as white citizens of the United States, to be enjoyed by all alike, or *equally;* and that this *right*, being thus conferred by the Constitution and laws of the United States upon all the citizens of the United States, colored and white alike, cannot be denied or abridged in a *local State* court, or by local State laws; but even that case does not pretend to hold that *rights* of a white person, conferred upon him by *the State as a citizen of the State*, must necessarily likewise be conferred by the State upon negro citizens of the United States residing in such State; and that case is *very far from holding* that when a *State law* confers a *duty* (not a privilege, not an immunity, not a right, but a duty,) upon some of its white citizens, it must necessarily follow, that the *like duty* must be conferred upon the colored man.

Again: It will be observed that the amendments to the Constitution and the Civil Rights law *nowhere* seek to confer upon the colored man the *right* to have a jury of his own race, or partly of his own race.

It is the *right of trial by jury*, that is conferred by the Constitution of the United States, but nowhere the right to have the jury composed of any class, condition or color.

Our State Constitution, art. III., §14, confers upon a prisoner the *right of trial* by a jury of *twelve men;* and the Legislature not being restricted by the Constitution (or in other words, the people by their representatives), has said that the juries in this State shall be composed of white men ; and by such a jury all men, white and black, under our State Constitution, when indicted for crime, have the right to be tried.

Citizens of the State have the *right* to bear *arms;* but service in the militia is a *duty,* not a right conferred.

Citizens have a right to vote; but service as commissioner of election is a duty imposed. Every citizen has inherent rights, which must yield to public duty under the law.

Trial by jury is a right given ; but service as a juryman is a *duty imposed* by law.

Did the law in Code of 1819 abridge the right of trial by jury, when it provided a *property* qualification to a juror ?

Does our jury law pretend to confer a *right* upon the *citizens* of the State to act as jurors ? No, by its very terms, it only imposes a duty—a *service*—upon "all white male persons who are twenty-one years of age and *not over sixty,* and who are citizens of this State," by making them (with certain exceptions) "*liable* to serve as jurors;" and it not only imposes that duty, but when that service and duty is performed, *it is paid for.*

What abridgement of *right* is there in this law, which only imposes an onerous service upon the white man ?

The right to hold office, to which counsel refers, is a right conferred upon every citizen; so is the right of *trial* by jury; but by no law, constitutional, statute or common, is there a right to *do service as a juror* conferred.

Again, the "Civil Rights Law" only professes to give to all persons the equal benefit of all laws and proceedings for the security of person and property, "as is *enjoyed by white citizens.*" Had not the prisoner the same benefits under the law that any white citizen could enjoy ? .

Counsel complain that the law requires a negro to select a jury of white men. That same law requires a white man, no matter what his age, to select as jurors, men between the ages of twenty-one and sixty years; and could complaint be made, the law declared unconstitutional, and a verdict set aside, because a white man of seventy years of age was compelled to be tried by jurors under sixty years old? Hardly, I think. Under our law the negro gets all the *rights* a white man has; can he ask for more?

The motion made in the court below by the prisoner was to remove his case to the circuit court of the United States for trial there.

Now, even if there was no reasonable doubt as to the unconstitutionality of our jury law, even if the prisoner had the undoubted right to have negroes on the jury, even if he had the undoubted right to have had his case removed under the provisions of said section 641, of the said judiciary act, it is submitted that the case he presents by his petition is not such a one as entitles him, even under that law, to such removal. That law provides that a case *may* be removed upon petition of the defendant, filed in the State Court, "*stating the facts* and verified by oath."

What then, must the petition show? Why, clearly *facts* which *show a case* in which the defendant is *denied* or *cannot enforce* the full and *equal* benefit to him, as a citizen of the United States, in the circuit court of Ohio county, of some " right *secured to him by a law providing for the equal* civil rights of citizens of the United States."

It is shown before, that this he has not done and cannot do in this case.

But what does his petition show? Why, only that he (as well as his wife, whom he slew), is a person of color, formerly a slave, emancipated years ago; and that no colored man can serve as a juror in West Virginia.

It avers that in time of slavery the relation of hus-

band and *wife* was not recognized between slaves in West Virginia, but does not aver, that that relation was not recognized both by the law and by the citizens, in 1874; the fact is, that then it was recognized both by law and public sentiment in Ohio county.

It avers, it is true, but in nowise shows, that colored men are not entitled to protection in their marital rights. It fails to show facts which show, that here colored men are not entitled to protection in their marital rights, or how or why, his defense depended upon such facts, if shown ; or how or why, if shown, he is denied the benefit of them ; or how or why they, if shown, are such as are " secured to him by a law providing for the equal civil rights of citizens of the United States?

Indeed, the marriage relation and marriage laws of a State are entirely subject to the state control, and in no wise affected by the civil rights law. See *State* v. *Gibson*, 10 Am. R. 42.

It fails to show how the service of white men upon the jury affects his enjoyment of any rights, conferred by the 14th amendment or the civil rights bill. He avers, that he *believes* he cannot have full and equal benefit— not of the laws mentioned in said acts of Congress—but of the laws of West Virginia, for the security of his person such as are enjoyed by white persons, but fails to give *any facts*, which show that he is *denied* the equal benefit, as a citizen of the United States, of any right secured to him by a law providing for the equal *civil rights* of citizens of the United States?

If sufficient *facts* are not shown, the petition does not conform to the requirements of the statute itself.

Simply because he is a negro, does not make out his case.

Simply because he is a negro, and slew a negress, his wife, does not make out a case.

The case of *The State* v. *Dunlap*, 4 Am. Law Times Reports, p. 205, to which counsel refers, and upon which he relies, decided in North Carolina in 1871, a case which

has never been reviewed and never sustained so far as I can learn—even that ease does not hold any such doctrine, as defendant asks this court to hold.

In that case the court clearly says, that the object of the act of Congress was not merely to prevent discrimination by the laws of the state, for the Judge there says : " Had the object been merely to prevent discrimination by the laws of the state, very few words would have answered the purpose, and there would have been no occasion for an affidavit in regard to matters, which must appear on the face of the public law ;" and he says distinctly, that " it does not extend to and attempt to control or regulate the prejudice of one race against the other ;" and further, he holds clearly that the petition must state such facts as show, that by reason of prejudice, a right conferred by the laws quoted, could not be enforced or was denied in the circuit court of the State in November 1874.

It will be seen too, by an examination of that case, that it was a case where a negro killed a *white man*, not another negro ; and that the petition and affidavit show upon their face facts—strong facts, tending to show that he might be denied a fair trial by a jury of the county of Mecklinburg.

But even that case does not show facts, which prove that the prisoner was *denied* the equal benefit with white citizens of the United States, in the enjoyment of any right, secured to him by *a law providing for the equal civil rights of citizens of the United States.*

Again attention is called to the fact, that this case now before this Court is one, where a negro killed one of his own color ; and it is asked, whatever the prejudice of white men might be, where a negro killed a white man, how can it be said that such prejudices exist when a negro kills a negro ? However natural such prejudices might be in the one case, like prejudices cannot be supposed to exist in the other.

As to bill of exceptions number seven, it is not

thought necessary to say much, for the Court knows well the rules governing the question of a new trial, where the verdict is claimed to be contrary to evidence. A jury, the judges of the evidence, has twice convicted the prisoner upon that evidence. The testimony shows abundant cooling time, and deliberate killing. It points out the prisoner's previous conduct and his premeditated purpose.

The other grounds embraced in this exception are covered by the discussion already given.

For like reasons it is unnecessary to discuss the eighth exception of the prisoner.

GREEN, PRESIDENT, delivered the opinion of the Court.

This case has been before this Court before, and is reported in 8 W. Va. 687. The opinion of the Court, delivered by President Haymond, states accurately what proceedings had taken place in the circuit court of Ohio county, prior to its being then brought before this Court. The following is a statement of the proceedings:

"At a circuit court held for the county of Ohio, on the 20th day of May 1872, there was found by the grand jury attending said court, "a true bill" of indictment against Taylor Strauder for the murder of Anna Strauder, in said county of Ohio. The indictment contains three several counts, each for the same murder; but they differ somewhat in the description of the offense. On the day the indictment was found, Taylor Strauder was led to the bar of the court in the custody of the jailer; and he then and there, in his proper person, demurred to the indictment; and the State by her attorney, joined in the demurrer. The court upon consideration overruled the demurrer; and thereupon he pleaded, that "he was not guilty in the manner and form as in the indictment against him is alleged, and of this he put himself upon the country;" and the State by her attorney did likewise. Afterwards, on the 6th day of June 1872, at a circuit court

held for the said county, this entry was made on the record of said court in the case, viz: "The State of West Virginia v. Taylor Strauder, upon an indictment for murder. On motion of the defendant, and for reasons appearing to the court, this cause is continued until the next term." Afterwards, on the 22d day of October 1872, he was again led to the bar of the court in custody of the jailer; and thereupon he moved the court for a continuance of the cause, until the next term, and the court granted the the motion and continued the cause accordingly.

On the 6th day of May 1873 was again led to the bar of the court, in custody of the jailer; and thereupon he moved the court to remand him to the county court of Ohio county, for examination of him upon the said charge of murder, whereof he stood indicted as aforesaid, according to the provisions of the act of the Legislature, approved on the 3d day of April 1873. But the court overruled the said motion, and refused to allow him the examination before the county court of the county of Ohio, under said Act of the Legislature, which he thus prayed; and he excepted to the opinion of the court overruling his said motion; and his bill of exceptions was signed, sealed and made a part of the record in the case. Thereupon came a jury of twelve men, who were elected, tried and sworn to well and truly try and true deliverance make between the State of West Virginia and said Taylor Strauder, and a true verdict render according to the evidence. The trial of the cause occupied the 6th, 7th and 8th of May 1873. On the day last named the jury found him guilty of murder in the first degree, in manner and form as he stood indicted. Whereupon he moved the court to grant him a new trial; and the court also overruled this motion. He afterwards, on the 8th of July 1873, and before judgment, prayed the court that judgment on the verdict of the jury, of guilty, be arrested for reasons assigned, which motion was also overruled by the court. The court thereupon rendered judgment upon the verdict of the jury, that he be hanged by the neck till

he be dead, and that execution upon the judgment be done upon him by the sheriff of Ohio county, on Friday the 20th day of August 1873, between the hours of ten o'clock A. M. and four o'clock P. M. of that day, at the usual place of execution. During the trial of the cause, Taylor Strauder excepted to several opinions of the court, not hereinbefore referred to, as appears by the record.

A writ of error was allowed him to the said judgment of .the circuit court; and the judgment of this Court thereupon rendered July 20, 1874, appears from the conclusion of said opinion of President Haymond, in 8 West Va. R., p. 705, which is as follows : "We, therefore, consider that the judgment of the said circuit court of the county of Ohio, rendered in this cause against Taylor Strauder, on the 8th day of July 1873, upon the verdict of the jury found in the case, whereby he was condemned to death, and the said judgment and order of the said circuit court in refusing and overruling said motion of the said Taylor Strauder, and all the proceedings of the said circuit court had in the case, after his said motion was so refused and overruled, be reversed and annulled, and that the verdict of the jury rendered in said case be set aside.

And this Court, proceeding to render such judgment, as the said circuit court ought to have rendered upon the said motion of said Taylor Strauder, to be remanded to the county court of the county of Ohio, to be examined by the said county court upon the said charge of murder in the said indictment alleged against him; it is considered that he be remanded to the county court of said county, to be examined by it upon the said charge of murder, in the said indictment alleged against him according to the provisions of the said act of the Legislature, entitled: 'An act providing for the examination of persons charged with a felony before the county court;' and be otherwise proceeded with by the said county court, according to the law made and provided." And

this Court accordingly so remanded him, with the requisite directions to carry out its said judgment.

When this case again came before the said circuit court of Ohio county, the following proceedings were had therein: On the 9th day of January 1875, there was found, by the grand jury attending said court, "A true bill" of indictment against Taylor Strauder for the murder of Anna Strauder, in said county of Ohio. The indictment contained three several counts, which were identical with those in the indictment found by the grand jury on the 20th day of May 1873. This bill of indictment was indorsed: "*The State of West Virginia* v. *Taylor Strauder*. A true bill;" signed, "Andrew Wilson, foreman." And this entry was made on the order book of said court of said date: "An indictment against Taylor Strauder for murder; a true bill. Andrew Wilson, foreman." On the day this indictment was found he was led to the bar of the said court, in custody of the jailer of said court; whereupon he moved the court to be discharged, for the reason that three terms of said court had passed since his commitment to jail for said offense, before the finding of said indictment; he also moved the court to quash said indictment, and further, moved the court to certify this case to the Circuit Court of the United States for the fourth judicial circuit, and in support thereof filed his petition therefor (which is copied in the second bill of exceptions),which motions, after argument by counsel and consideration by the court, were all overruled. And thereupon the prisoner demurred to the indictment and each count thereof, and the State, by its attorney, joined therein; and the court, on consideration thereof, overruled said demurrer. Whereupon the prisoner pleaded, that he was not guilty in the manner and form, as in the indictment against him was alleged; and of this he put himself upon the country; and the State did the like. And thereupon came a jury, who were elected, tried and sworn to well and truly try and a true deliverance make between the State and the

said prisoner at the bar. The trial of the cause before this jury, occupied the 2d, 3d, 4th and 5th days of November 1874; on the day last named, said jury found a verdict as follows :

"We, the jury, find the prisoner guilty of murder in the first degree, as charged in the indictment.

"MICHAEL ROTH, *Foreman.*"

Whereupon the prisoner moved the court to set aside said verdict and grant him a new trial, which was continued for future consideration ; and the prisoner was remanded to jail. At the same term of the court, on January 9, 1875, he was again led to the bar of said court in the custody of the jailer; and the court having maturely considered his said motion for a new trial, refused the same; and thereupon the prisoner moved, that the judgment on said verdict might for reasons assigned, which are set forth in the eighth bill of exceptions, be arrested; but the court overruled this motion; and nothing further being alleged why the sentence of the court should not be pronounced, the court thereupon rendered judgment upon the verdict of the jury : that he be hanged by the neck till he be dead, and that execution of this judgment be done upon him on Friday the 26th day of March 1875, between the hours of ten in the forenoon and four in the afternoon of the same day, at the usual place of execution, in the vicinity of the city of Wheeling, it appearing in the opinion of the court that there is no jail yard of sufficient size for said purpose ; thereupon he was remanded to jail.

Upon the trial of the case the prisoner excepted to various opinions and rulings of the court, and tendered eight bills of exceptions, which were as follows :

*Bill of Exceptions No.* 1.

*Be it remembered,* That when the defendant in this cause was called upon, at the October term 1874, to answer to the indictment in this cause, he demanded of the attorney for the State to elect upon which indict-

ment he would proceed to try him, whether the one found at the May term 1872, or the one at the present term; and thereupon the said attorney for the State elected to try the defendant upon the indictment found at the present term; and thereupon the defendant moved the court to discharge him from custody, because the said indictment had not been found before the end of the second term of the court after he was in custody and filed the *mittimus* of the justice in support thereof, which is in the words and figures following:

STATE OF WEST VIRGINIA,
        *Ohio County, to-wit:*

To *Robert Junkins, who was appointed by me to act in this case as special constable of Madison township in said county, and to the keeper of the jail of said county:*

These are to command you, the said constable, in the name of the State of West Virginia, forthwith to convey and deliver into the custody of the keeper of the said jail, together with this warrant, the body of Taylor Strauder, charged before me, Robert H. Gillespy, a justice of said county, by an inqusition with a felony by him committed, in this: that the said Taylor Strander on the 18th day of April, in the year 1872, in the said county, did wilfully murder Annie Strauder with a hatchet or other weapon. And you, the said keeper of the said jail, are hereby required, in the name of the State of West Virginia, to receive the said Taylor Strauder into your jail and custody, that he may be examined for the said offense by me on the 26th day of April 1872, at my office in the township of Madison, said county, and him there safely keep, unless he shall be discharged by due course of law.

Given under my hand and seal this 25th day of April, in the year 1872.

                ROBERT H. GILLESPIE, *Justice.*

Also the orders of the circuit court showing that more than two terms of the court had elapsed.

But the court overruled the said motion and refused to discharge the defendant from custody, to which opinion and ruling of the court the defendant excepted, and prayed that his exception might be signed, sealed and made a part of the record, which is accordingly done.

T. MELVIN, [Seal.]

### Bill of Exceptions No. 2.

*Be it remembered,* That when this cause was called for trial, and before the trial commenced, on the — day of — 1874, in the circuit court of Ohio county, West Virginia, the defendant filed a petition praying that his cause might be removed to the Circuit Court of the United States for reasons in said petition assigned, which said petition is in the words and figures following, to-wit:

### To the Honorable Judge of said Court:

The petition of Taylor Strauder, the above named defendant, respectfully represents unto your honor, that he is a citizen of the United States and was indicted at the October term 1874, of the circuit court of Ohio county, for the alleged murder of Annie Strauder. Your petitioner further represents, that he is a person of color and was formerly a slave, and was emancipated by the result of the late rebellion. Your petitioner avers that under the laws of Virginia and West Virginia, the relation of husband and wife was not recognized between slaves, and that an impression is general in this county and the adjacent ones, and throughout the whole State, that colored men are not entitled to the same protection in their marital relations as white men. That the defense of this petitioner will depend greatly upon the fact of the petitioner having been a married man at the time the offense he is charged with was committed. Your petitioner further avers, that under and by virtue of the laws of the State of West Virginia, no colored man is eligible to be a member of the grand jury or serve on a

petit jury in this State; and that white men are so eligible; and your petitioner, by reason of his being a colored man and of his having been a slave, has reason to believe and does believe that he cannot have the full and equal benefit of all laws and proceedings in the State of West Virginia for the security of his person, as is enjoyed by white citizens, and that he has less chance of enforcing in the courts of this State his rights in this prosecution as a citizen of the United States, and that the probabilities of a denial of them to him as such citizen on every trial, which might take place on this indictment in the courts of this State, are much more enhanced than if he was a white man. Your petitioner hereby offers to give good and sufficient security for his filing, at the next Circuit Court of the United States for the fourth judicial circuit on the first day of its next session, copies of the processes and proceedings in this case, and likewise offers to give bail for his apperance, if your honor should discharge him from custody (your petitioner being a close prisoner). Wherefore your petitioner, the said Taylor Strauder, prays your honor will make such orders in the premises, as may be consonant to law, and according to the form of the act of Congress, in that behalf made and provided.

TAYLOR STRAUDER.

STATE OF WEST VIRGINIA,
        Ohio County to-wit:

Taylor Strauder, the petitioner named in the foregoing petition, personally appeared before me, and being duly sworn, says that the facts and allegations therein contained are true.                TAYLOR STRAUDER.

Sworn to and subscribed before me, the undersigned, this 2d day of November 1874.

JOHN O. PENDLETON, Notary Public.

But the court, being of opinion that the said defendant was not entitled to have his cause removed to the Circuit Court of the United States, for the reasons ap-

pearing in said petition, denied the prayer of the petitioner, and refused to certify the cause into the Circuit Court of the United States, and compelled the said defendant to proceed to trial in the circuit court of Ohio county, West Virginia. To which opinion of the court denying the prayer of the said petitioner for the removal of his cause to the Circuit Court of the United States and compelling him to proceed to trial in the circuit court of Ohio county, West Virginia, the defendant excepted and prayed that this his exception might be signed, sealed and made a part of the record, which is done accordingly.        T. MELVIN. [Seal].

### Bill of Exceptions No. 3.

*Be it remembered,* That before the trial of this cause the defendant moved to quash the *venire facias,* and the return thereon, which are in the words and figures following, to-wit:

THE STATE OF WEST VIRGINIA,

*To the Sheriff of Ohio County, Greeting:*

We command you that you summon thirty good and lawful men of your county, duly qualified to serve as jurors, to be and appear before the Judge of the circuit court of Ohio county, on Monday the 19th day of October 1874, to serve during the said term as jurors for the trial of causes, unless sooner discharged. And have then there this writ.

Witness, Samuel B. McColloch, clerk of our said court, at the court house of our said county, this 18th day of September 1874, and in the 12th year of the State of West Virginia.

SAMUEL B. McCOLLOCH, *Clerk.*

List of jurors drawn by the undersigned, September 18, 1874, to serve at the October term 1874, of the circuit court. Then follows a list of thirty jurors.

Executed by summoning the following drawn jurors: 1 John Branstroup, 2 Martin Ewing, 3 Brice Supler,

4 Jabez Exley, 5 Theo. Darrah, 6 H. N. Hirst, 7 John Barr, 8 David Atkinson, 9 non-resident, 10 Caleb Sylvis, 11 S. Welty, 12 F. M. Porter, 13 James Kerr, 14 Louis Keller, 15 Samuel Kline, 16 John Medick, 17 Louis Wagner, 18 Edward Steele, 19 W. E. Hughes, 20 James M. Todd, 21 Joseph Debold, 22 Louis Meder, 23 Henry Roemer, 24 Geo. Roth, 25 not found, 26 Leonidas Bruner, 27 W. F. Carter, 28 Charles Kraus, 29 Jacob Dick, 30 Fred. Werner.

G. W. KENNEDY, *D. S.*,

*October* 12, 1874.      *for R. S. Brown, S. O. C.*

Stephen Berry is no inhabitant of my bailiwick, nor found therein October 12, 1874.

G. W. KENNEDY, *D. S.*

*for R. S. Brown, S. O. C.*

J. B. Lyle not found within my bailiwick October 12, 1874.

G. W. KENNEDY, *D. S.*

*for R. S. Brown, S. O. C.*

Because the said writ was not issued according to law, was not formal and was not issued for the trial of Taylor Strauder, the defendant in this cause ; because the law, under which it was issued, was unconstitutional, null and void ; and further because the return thereon was not made according to law ; but the court overruled the said motion, and refused to quash the said *venire facias*, to which ruling of the court the defendant excepted, and prayed that his exception might be signed, sealed and made a part of the record, which is accordingly done.

T. MELVIN. [Seal].

*Bill of Exception No. 5.*

STATE OF WEST VIRGINIA, ⎫  *Circuit Court for Ohio*
              *vs.*           ⎬        *County.*
TAYLOR STRAUDER.      ⎭

*Be it remembered,* That after the jury had been examined upon their *voir dire,* accepted and sworn, and after considerable testimony had been taken, on the third day

1877.
Special Term.

State
v.
Strauder.

of the trial, the counsel for the prisoner approached the judge presiding, and advised him in a low tone of voice, that information had recently been received that one of the jurors, Edward Larkin, had, before being sworn as a juror, expressed an opinion adverse to the prisoner, and showed him and left upon his table the affidavits of James A. Robinson, the prisoner and his counsel, which affidavits are in the words and figures following:

CIRCUIT COURT FOR OHIO COUNTY.

STATE OF WEST VIRGINIA,
Ohio County, to-wit:

Personally appeared before me, the undersigned, James A. Robinson, who being first duly sworn, deposes and says, that during the latter part of July or the first part of August 1874, Edward Larkin, one of the jurors now sitting and impanelled on the trial of State of West Virginia vs. Taylor Strauder for murder, the said Edward Larkin was passing my place of business, No. 1050 Market street, in the city of Wheeling; he asked me what I thought ought to be done with Strauder. I replied I did not care what was done with him; what do you think ought to be done with him? He replied in positive terms: He killed his wife, and he should be hung for it. There were some other words to the same effect, when a customer called, and I had to go into the store, and the conversation ceased. This was about the time the case of Strauder was before the Supreme Court in this city; and I suppose that fact brought up or caused the conversation. And further deponent says not.

JAMES A. ROBINSON.

Subscribed and sworn to before me, this 4th day of November, 1874.        SAMUEL B. McCOLLOCH, Clerk.

STATE OF WEST VIRGINIA, OHIO COUNTY, to-wit:

STATE OF WEST VIRGINIA, } Circuit Court of Ohio
vs.                      } County.
TAYLOR STRAUDER.

Personally appeared before me, the undersigned, Tay-

lor Strauder, the defendant in the above cause, who being duly sworn says, that he had no knowledge of the fact that Edward Larkin, one of the jurors, had at any time expressed an opinion, or stood otherwise than indifferent on the issues involved in the trial of his cause at the time the juror was sworn, and only at this time for the first time, learns of the facts contained in the affidavit of James A. Robinson filed in this cause.

TAYLOR STRAUDER.

Subscribed and sworn to before me this 4th day of November, 1874.

S. B. McCOLLOCH, *Clerk.*

STATE OF WEST VIRGINIA, OHIO COUNTY, *to-wit:*

| STATE OF WEST VIRGINIA, vs. TAYLOR STRAUDER. | *Cricuit Court of Ohio County.* *Indictment for murder.* |

Personally appeared before me, the undersigned, Geo. O. Davenport and B. B. Dovener, counsel for the defendant, Taylor Strauder, in the above case, who being first duly sworn, depose and say, that they had no information of the bias or prejudice of the juror, Edward Larkin, at the time he was sworn upon his *voir dire* or at the time of his being sworn upon the jury, and that only at this time for the first, are they informed of the facts contained in the affidavit of James A. Robinson, filed in this cause as to the bias and prejudice of the said juror, Edward Larkin.          B. B. DOVENER.

GEC. O. DAVENPORT.

Subscribed and sworn to before me this 4th day of November, 1874.

SAMUEL B. McCOLLOCH, *Clerk.*

| THE STATE OF WEST VIRGINIA, vs. TAYLOR STRAUDER. | *In the Circuit Court of Ohio County.* |

Personally appeared before me, the undersigned, Edward Larkin, who being duly sworn deposes and says, that he has read and examined the affidavit of James A.

Robinson, filed for the defendant in the above entitled cause, that he did not on the occasion referred to in said affidavit, or on any other occasion say to him or any one else, that Taylor Strauder had killed his wife and should be hung, or any words to that effect; that on the contrary he has never entertained any prejudice or bias towards the said defendant.          EDWARD LARKIN.

Subscribed and sworn to before me this 5th day of January, 1875.          R. H. GILLESPIE, *J. P.*

But the prisoner and his counsel made no motion based upon said affidavits, or looking to any action on the part of the court relating to the said juror, and the court took no action upon the said affidavits, and allowed the trial to proceed without any objection formally made on the part of the prisoner. And after the jury had returned their verdict, the prisoner moved the court to set aside the verdict and grant him a new trial of the cause upon the ground, among others, that the juror Larkin had expressed an opinion hostile to the prisoner, as shown by the said affidavit of James A. Robinson; whereupon the State, by its attorney, submitted the counter affidavit of the juror Larkin, which affidavit is in the words and figures following, to-wit:

THE STATE OF WEST VIRGINIA  } *In the Circuit Court*
          *vs.*  } *of Ohio County.*
   TAYLOR STRAUDER.

Personally appeared before me, the undersigned, Edward Larkin, who being duly sworn deposes and says, that he has read and examined the affidavit of James A. Robinson, filed for the defendant in the above entitled cause, that he did not on the occasion referred to in said affidavit, or on any other occasion say to him or any one else, that Taylor Strauder had killed his wife and should be hung, or any words to that effect; that on the contrary he has never entertained any prejudice or bias towards the said defendant.          EDWARD LARKIN.

Subscribed and sworn to before me this 5th day of January 1875.          R. H. GILLESPIE, *J. P.*

And thereupon the court overruled the motion of the prisoner and refused to grant a new trial of the cause; whereupon the prisoner excepted and asked that this his bill of exceptions be signed, sealed and made a part of the record, which is accordingly so done.

T. MELVIN, [Seal.]

*Bill of Exception No. 6.*

CIRCUIT COURT FOR OHIO COUNTY.

STATE OF WEST VIRGINIA.⎫
         *vs.*        ⎬ *Indictment for murder.*
TAYLOR STRAUDER.⎭

*Be it remembered,* That on the trial of this cause, the defendant moved the court to instruct the jury in the words and figures following, to-wit: "If the jury entertain a rational doubt as to the soundness of the mind of the prisoner at the time of the commission of the homicide charged, he is entitled to the benefit of that doubt, as he would be to the benefit of a doubt as to any other material fact in the case, it being under our statute a necessary ingredient of the offense, that the person charged shall at the time of the commission of the offense be of sound mind, although the jury may believe he had judgment and reason sufficient to discriminate between right and wrong in the ordinary affairs of life, even at the time of the commission of the offense, they cannot find him guilty."

But the court overruled said motion, and refused to give said instruction to the jury; but in lieu thereof gave the following instruction, to-wit: "To entitle the prisoner to an acquittal, upon the ground that he was insane at the time of the commission of the offense charged in the indictment, such insanity must be proved to the satisfaction of the jury; though in passing upon this question, they may look upon the whole evidence in the cause, as well that for the State as for the prisoner."

To which opinion of the court overruling the prisoner's motion, and denying and refusing to give the instruction to the jury asked for, as well as the giving of the instruction to the jury as aforesaid in lieu of the instruction asked for, the defendant excepted, and prayed that this his exception might be signed, sealed and made a part of the record which is accordingly done.

T. MELVIN. [Seal].

*Bill of Exception No. 7.*

CIRCUIT COURT FOR OHIO COUNTY.

STATE OF WEST VIRGINIA,
        *vs.*          } *Indictment for Murder.*
    TAYLOR STRAUDER.

*Be it remembered,* that after the jury had returned a verdict of "guilty of murder in the first degree" in this cause, the defendant moved the court to set aside the said verdict and grant him a new trial upon the several grounds set forth in the bills of exceptions herein marked Nos. 1, 2, 3, 4, 5 and 6, and for the reason that the facts proved, as shown by the certificate of the evidence herewith presented, would not support a verdict of murder in the first degree. (See statement of evidence filed herewith marked "Certificate of Evidence.") But the court overruled the said motion, and refused to grant the defendant a new trial, to which ruling of the court the defendant excepted and prayed that his exception might be signed, sealed and made a part of the record, which is accordingly done.

T. MELVIN. [Seal].

*Bill of Exception No. 8.*

CIRCUIT COURT FOR OHIO COUNTY:

STATE OF WEST VIRGINIA
        *vs.*          } *Indictment for Murder.*
    TAYLOR STRAUDER.

And now, after verdict and before sentence, comes the said Taylor Strauder, and prays that judgment may be

arrested, and assigns for cause, because of the uncertainty and insufficiency of the indictment; because the *venire facias* was informal and not issued according to law, and because there was no proper return thereon; because the jury were not properly sworn; and because it appearing from the record that the defendant was a man of color, and was a slave emancipated by the late rebellion, and that he petitioned to have his cause removed to the circuit court of the United States for reasons appearing on the face of the petition; and because it appears from the record that since his arrest and commitment, more than two terms of the circuit court had been held before the indictment, on which he was tried, was found, and the prisoner, before pleading to said indictment, moved the court to discharge him from custody for that cause; because the juror Edward Larkin should have been withdrawn by the court, at the time his incompetency was suggested by the prisoner; and for other manifest defects in the record appearing. But the court overruled the said motion, and sentenced the defendant to be executed on the 26th day of March 1875, to which ruling and sentence the defendant excepted, and prayed that this his exception might be signed, sealed and made a part of the record, which is accordingly done.

T. MELVIN. [Seal].

The certificate of evidence, referred to in the seventh bill of exceptions, shows the following facts were proven at the trial:

Annie Strauder was a negress, the daughter of Barbarra Sly; she married one Gus Green; he took her to Kentucky and abandoned her, leaving with her two children; she then returned to her mother in Wheeling, and was divorced from her husband; about June 1871, she married the prisoner, Taylor Strauder, a negro carpenter; he was a peaceable, quiet, industrious and sober man, but lived unhappily with his wife; his wife was guilty of adultery with different persons, negroes and white men;

100

Taylor Strauder, as well as others, strongly suspected her of being guilty of adultery; and his acquaintances occasionally jeered him about his wife's conduct. This conduct of hers and the jesting about it by his acquaintances annoyed Taylor Strauder, and occasioned frequent quarrels between him and his wife, and resulted sometimes in his using violence to her person and threats of killing her. A month or so after their marriage she had him arrested for threatening to kill her; he suspected her of adultery with a negro named Elijah Pullins, who visited her house during his absence, and frequently teased him about his wife's want of chastity; this led to the difficulty, which resulted in his wife procuring the warrant for his arrest; he was however anxious to settle this difficulty with his wife, and sent an acquaintance to her to bring about a settlement; this acquaintance learned from her what their difficulties arose from, and urged her not to permit other men, and particularly Pullins, to come to the house at all. The matter was settled and the warrant to arrest him was destroyed; still they did not live happily together; he treated her well, except when angered by her improper conduct, or teazed about her conduct by his acquaintances. He would then quarrel with her, and sometimes use violence and threats. About two months after their marriage, and about eight months before she was killed, she threatened to leave him; and he said he would kill her before she should leave; but the evidence does not show the origin of this difficulty; nor does he then appear to have used any violence to her, only abusive language. On another occasion they had a quarrel on the street, because she insisted on going to a ball, which he thought was no fit place for her to go to, but she would go, and he went after her to bring her away; the bad feeling arising from this lasted for a while, but they were again reconciled. Some five or six weeks before she was killed they quarreled; he seized hold of her, and she seemed to apprehend that he would kill her; and an officer arrested him. The

origin of this difficulty is not shown by the evidence,
but may be inferred from the Commonwealth's witness saying, that at that time Taylor Strauder "first said he
loved that woman, and then he was sorry he had not killed her." These difficulties between them, all apparently having their origin in the same source, seem to have lasted but a short time, when they would be reconciled, and again would have a like difficulty. About two weeks before she was killed, a witness states that he met him, and he seemed to be very unhappy, and told the witness he had something he wanted to tell him ; but the witness, being then in a hurry, did not wait to hear what he had to tell ; and he did not afterwards tell him. Two days however before she was killed, they seemed to be entirely reconciled. A witness uses this language : "I was going down the alley, and she called me and I went over, and she was trying to learn him to read. I thought they were sitting very lovin' there, and I stayed fifteen or twenty minutes. They were actin' very nice and very well together then." This was at his (Taylor Strauder's) house. The night of the next day, April 17, 1872, he was at Miller's saloon, on Market street, in Wheeling ; went there about nine o'clock at night. There were fifteen or twenty negroes there; some of them drunk. They played dominoes in the back room. Taylor Strauder did not get drunk, but it is probable he drank some; he had some fuss with one of the parties, and something of a fight, in which he was thrown down but not hurt. Afterwards, while in the back room, where games were played, Elijah Pulling said to him : "You damned son of a bitch, you had better go home ; I expect there is some one in bed with your wife now." He said nothing in reply, but walked out and went into the saloon part of the building. He remained there some time, probably a half an hour, when he asked the keeper of the saloon for his bucket, saying he was going home. It was then about half-past eleven o'clock. Frank Rawley said : "he had better go home, that may be somebody was in bed with his wife

then, that some one had been sleeping with her." He made no reply, started for his home with Charles Gardner, who went by his house. On his way he did not, by conversation or otherwise, show that he was angry. When he nearly reached his home he said: "he expected his wife would give him hell for not bringing the yeast home." He went in his house, what occurred in his house that night and afterwards was thus stated by Taylor Strauder, after he was arrested some days subsequently in Pittsburgh. He said: "that as he was going in at his door he saw a white man going out the back door, and that he asked his wife about it, and she denied of anybody being there at all, and they wrangled all through the night about it; and in the morning she got up; she was sitting at the fire putting on her shoes, and there was a hatchet lying there; and he still insisted on this white man being there, and she denied it, and he picked up the hatchet and hit her twice. Then he got across the river and got up in a coal mine, and he started back; but his heart failed him, and he went back up the river, and near Portland he was taken before an officer, but he let him go." He also stated that his step-child was in the room when he killed his wife; and that he told her that he would kill her if she made any noise or got up. This statement made by him is probably in all respects true. It is corroborated by the child, a daughter of his wife by her former husband. She was a child then eight years and seven months old, scarcely as intelligent as children usually are at that age, but disposed apparently to tell truthfully all she knew or could remember. She seemed to have no idea of time or distance. She stated that she and her mother went to bed that night together; that next morning she found she had been put out of the bed on the lounge; that during the night she heard them quarreling about a man being there, she thinks. That her mother was in the rocking chair lacing her shoes next morning after daylight, when Taylor Strauder took the hatchet and killed her. She can not

remember what had been said before that in the morning by Taylor Strauder or his wife, except he asked her where his shoes were, and she told him just where he put them. She says that, after he struck her mother with the hatchet, he went out, but before so doing, told her to lie still and not hollow, or he would come back and kill her. After a time she got up and went to her mother, who was sitting in the chair dead, and told her to raise her head up, may be she would not die. This was a short time after Taylor Strauder left the house. This child could give no detailed account of what she saw or heard; but the few things she did state, she could be made to state but in one manner; and she seemed to be telling truly what she did remember, and refusing to say anything she did not remember. The body of Annie Strauder was found by others about seven o'clock in the morning of Thursday, April 28, 1872; she was sitting up in a rocking chair, leaning over on one of her hands; she was dead, but her body was still warm; there were two wounds on her head, evidently made by blows of a hatchet, which was on the floor three or four feet from Annie Strauder's body. The pole of it was all bloody, and there were clotted hairs on the hatchet. There was a pool of blood on the floor, which had dripped from her head, as she sat in the chair. There were two wounds on her head, one on the left temple, the other behind the left ear, either sufficient to produce death. A large mass of testimony was certified as taken, but the above is the substance of all that seems material.

On the 9th day of March, 1875, a writ of error was accorded Taylor Strauder to the said judgment of the said circuit court, rendered on the 9th day of January, 1875.

The errors aforesaid, assigned in the petition for the writ of error, will be considered in the order in which they have been presented by the petition. The first error assigned is: "The court erred in not discharging the prisoner from custody, three terms having elapsed since he was impris-

oned, and no indictment having been found." A preliminary question arises in considering this assignment of error; is this court, in deciding this point, confined to the consideration of the facts set forth in this first bill of exceptions, that is the *mittimus* of the justice Robert H. Gillespie, dated April 25th, 1872, ordering a special constable to arrest Taylor .Strauder, charged with the murder of Annie Strauder, and ordering the jailor to receive him into custody, that he might be examined for said offense on the 26th day of April, 1872, and the orders of the circuit court of Ohio county showing, that more than two terms of said court had elapsed since the date of said *mittimus* to the time, when said second indictment was found by the grand jury; or can this court in acting on this question, properly look at the record in this Court, upon the former writ of error. This question is answered by the 7th section of chapter 17 of the Acts of 1872-3, page 58, which is: "The appellate court may, when a case has before been in such court, inspect the record upon the former writ of error." This provision applies equally to civil and criminal cases.

In *Adcock's case*, 8 Gratt. 661, a motion was made by the prisoner to be discharged from the offense, on the ground that three regular criminal terms of the court had been held, since he was examined and remanded for trial for said offence, without his being indicted for the same. And on the trial of this motion the commonwealth introduced the record of the proceeding under the former indictment for the same offense, upon which a trial had been had, and a verdict of the jury against the prisoner, and a new trial awarded by the judge, because of a variance between the allegations in the indictment, as to the ownership of the goods alleged to have been embezzled, and the proof. The commonwealth had entered a *nolle prosequi*, to the first indictment, before the finding of this second indictment for the same offence. It was obviously proper in that case to introduce the record in the old case, as a *nolle prosequi* had been entered in it; and

the record in it constituted no part of the record in the new case, and could not have been inspected therefore by the court, unless it had been introduced in proof. In the case before us no *nolle prosequi* has ever been entered, and the former proceedings constitute a part of the record in this case, which the statute expressly authorizes us to inspect. When inspected, it shows that Taylor Strauder was indicted at the term of the court held on May 20, 1872, within less than one month after the date of the warrant of Justice Gillespie, filed with the first bill of exceptions; and that, at the first and second terms of the court after the indictment was found, the cause was continued for the prisoner on his motion, and at the third term it was tried, a verdict found against the prisoner, and sentence pronounced against him ; to which he obtained a writ of error, and this Court annulled this sentence, because the court below had refused to remand the prisoner to the county court, that he might be examined for the offense charged. His discharge from custody was asked under the 12th section of chapter 158 of Code of W. Va., p. 715, which provides : "that a person in jail, on a criminal charge, shall be discharged from imprisonment, if he be not indicted before the end of the second term of the court, at which he is held to answer," except in certain specified cases. The entire record being inspected in this case, it appears that the prisoner was indicted at the first term of the circuit court after he was arrested. Even if we did not inspect the record of the case as it was before us formerly, the prisoner does not, by the evidence he has adduced, entitle himself to be discharged ; for, while he shows that five terms of the court had elapsed since the warrant was issued for his arrest, yet he entirely fails to show what was the return on this warrant, or that he was arrested under it; and looking only to the record brought up to us now, he may not have been arrested under this warrant issued by Gillespie, but for all that appears to the contrary might have been just arrested ;

unless we are to infer his arrest in 1872 from the statement in bill of exceptions number one, that the attorney of the State elected not to try the prisoner under the indictment found at the May term, 1872. And if we should from this draw such inference, it would at the same time show, that he had been indicted at the first term, after which a warrant for his arrest had been issued. It is unnecessary to determine whether his motion, under this section of the Code to avail him, ought not to be made before his indictment; as in this case, if so made, he would not have been entitled to be discharged from imprisonment. Nor would he, had he asked it, been entitled to be discharged from prosecution for the offense, under the 25th section of chapter 160 of the Code of W. Va., p. 721, which provides for the discharge of a prisoner from prosecution for ever, if not tried within three terms of the court after his indictment, except under certain specified circumstances. In *Adcock's case*, 8 Gratt. 661, it was held that, if a prisoner was indicted, tried and convicted in time, and the verdict set aside for a variance between the allegations in the indictment and the proof, such as did not preclude the commonwealth from again indicting the prisoner for the offence, such second indictment, if found promptly after the abandonment of the first, is in good time, and the prisoner is not entitled to his discharge, though more than three terms had elapsed since his examination and former indictment. There was therefore no error of the court in overruling this first motion of the prisoner.

The next error assigned is: that the court " should have quashed the indictment on the prisoner's motion," the prisoner also demurred to the indictment and to each count thereof, which the court overruled. No argument is presented by the prisoner's counsel in this Court for either of these points; and I see no reason why the indictment should have been quashed, or the demurrer sustained. The indictment is in the exact words of the former indictment, the demurrer to which was overruled

by the circuit court, and its judgment in so doing sustained by this Court, when the case was before it on the former writ of error, sec. 8 W. Va. 689. There was therefore no error in the overruling by the circuit court of this second motion of the prisoner.

The third error assigned is: that " the court should have granted the prayer of the prisoner to have his cause removed to the circuit court of the United States."

The revised statutes of the United States, section 640, under title 13, chapter 7, (see R. Statutes of U. S. p. 114), provide among other things " when any criminal prosecution is commenced in any state court against any person who is denied, or cannot enforce, in the judicial tribunal of the State, or in that part of the State where such prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, such prosecution may, upon the petition of such defendant filed in said State court at any time before the trial, stating the facts, and verified upon oath, be removed for trial in the next circuit court to be held in the district where it is pending." And section 1977 of the Revised Statutes of the United States under 24th title " Civil Rights " p. 348, provides: "All persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and executions of every kind and to no other.

The authority of the Congress of the United States to pass these acts, is claimed under the thirteenth and a portion of the fourteenth amendments of the Constitution of the United States, which are in these words: " Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party has been duly

1 01

convicted, shall exist within the United States at any place subject to their jurisdiction." And "all persons, born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." And under a general provision applying to both the fifteenth and fourteenth amendments "Congress shall have power to enforce the provisions of this article by appropriate legislation."

Before considering the question whether the court erred in refusing to remove this case to the circuit court of the United States on the application of the prisoner, I will consider the true meaning of these amendments of the Constitution, and the acts of Congress passed, as is claimed, by their authority. And first I will consider the question what is the meaning and scope of these amendments of the Constitution. If they do not authorize Congress to legislate, so as to give jurisdiction to the federal courts in such a case as is presented, it will be useless to go further and consider, whether the acts of Congress cited intended to permit the federal courts to take jurisdiction ; for if these amendments to the Constitution do not confer on Congress the power so to legislate, such legislation is unauthorized and void, being unconstitutional. What then is the true interpretation of the first section of the fourteenth amendment of the Constitution above quoted, it being the only one which really has any bearing on the question under discussion? This first section is divided into four clauses.; the first is: "All persons, born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." The evident object of this clause, was to settle

forever a question, which for many years had been the subject of bitter controversy : whether every person, born in the United States and subject to their jurisdiction, was a citizen. In the case of *Dred Scott* v. *Sandford*, 19 How. 393, the Supreme Court of the United States decided that a negro, though he might be a freeman, was not and could not be a citizen. This decision, though disapproved by many lawyers, had never been overruled. By this decision the whole negro race were not only not citizens, but were incapable of becoming so, except by an amendment of the Constitution of the United States. To remove this difficulty was the object of the first clause above quoted ; and it was obviously the principal, if not the whole object of the entire first section of the fourteenth amendment of the Constitution of the United States; the other clauses, as we shall presently see, were principally intended to insure the carrying out of this first clause to its full extent; and if they add anything to its force or scope, such addition is very small and practically amounts to nothing. It is true that Judge Swayne in the case of the *United States* v. *Rhodes*, decided in February 1868, by the Circuit Court of the United States for the district of Kentucky, and reported in the American Law Times Reports, vol. 1, p. 23, had decided that all persons born in the United States and subject to their jurisdiction were citizens; and Congress had by the act of April 6th 1866, so expressly declared. But as this act of Congress and decision of the circuit court of Kentucky were in direct opposition to the decision of the Supreme Court of the United States in the *Dred Scott case*, it was wisely considered that neither this act of Congress, nor this decision of Judge Swayne would ever be acquiesced in as setting aside a soleran and well considered decision of the Supreme Court of the United States. And hence the passage of the fourteenth amendment of the Constitution of the United States. The next clause of this amendment is, "No State shall make or enforce any law, which shall abridge the privi-

1877.
Special Term.

State
v.
Strauder.

leges or immunities of citizens of the United States." This was really no new provision in the Constitution of the United States ; a provision was already in the Constitution, which in effect and almost in words corresponded with this clause. The first clause in the second section of article four of the Constitution provides: " The citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States." It is obvious on inspection, that the only change made by this second clause is to insert instead of " citizens of the several States," in the 4th article, the words, " citizens of the United States." The object in making this change of phraseology is obvious. It was not thereby intended to confer on anybody, any new rights privileges or immunities. It had been said by eminent judges, that no man was a citizen of the United States, unless he were a citizen of one of the States of the Union. Those therefore who had been born and resided always in the district of Columbia or in the territories, though within the United States, were not citizens. Whether this proposition was sound or not, had never been judicially decided by the Supreme Court of the United States. A great controversy had been carried on by statesmen as to the character of the government of the United States, and whether any allegiance was due from the people directly to the United States, or whether their allegiance was due only to the states severally. In view of these difficulties, it seems highly probable that this change of words, the substituting of "citizens of the United States" for "citizens of the several states," was made to have its effect on these mooted questions. It is unnecessary to determine what effect, of this character, they may have. Its effect, if any of this sort, is a political effect ; and a case can hardly arise in which it can become proper for the courts to express an opinion upon its effect in this respect. We can however with great confidence say that this change of phraseology can have no effect whatever on the rights, immunities or

privileges of any person whatever. The first clause of the 2d section of article 4 of the Constitution expressly confers on the citizen of each state all the privileges and immunities of citizens of the several states. And this is all the effect of this provision of the 1st section of the 14th Amendment, so far as it operates on the immunities and privileges belonging to any person. By denying to the states the right to abridge the immunities of the "citizens of the United States," was evidently meant the denying to a State the right to abridge the immunities of persons having permanent residences in other states, or in the territories, as distinguished from citizens of the state. The rights of the states over its own citizens was not intended to be changed by this amendment of the Constitution ; and a state may now deny to any of its own citizens, any rights and immunities whatever, excepting only such as are protected from violation by express provision in the Constitution of the United States. These rights and immunities thus protected are but few, and are specifically enumerated ; as for instance, the right to have one's contract enforced, which is protected by the provision that no state shall impair the obligation of contracts. It is true that the Congress of the United States, in the passage of the Civil Rights Act, before quoted, evidently assumed that this 14th Amendment had conferred on the United States powers far beyond those, which this interpretation would confer; and that the states were by this 14th Amendment restricted to a great extent in their power of denying to their own citizens rights and immunities, which had theretofore been considered under the control and protection of the state governments. It is also true that certain of the judges of the Circuit Courts of the United States under unfavorable surroundings, and at times when their judgment was warped by the general condition of the country, have given to this Constitutional amendment, and especially this clause, a far wider scope than I have indicated. But the Supreme Court of the United States has disapproved of such

broad construction of this amendment, and has, with constantly increasing clearness, declared these constructions, whether made by the circuit Judges, State courts, or Congress, were unjustifiable. Their most recent decisions approximate closely to the views I have above expressed. A few examples of these perverted views of this amendment, repudiated by the Supreme Court of the United States, will be cited. Thus in the case of *The State* v. *Dunlap*, decided by the supreme court of North Carolina, in June 1871, reported in the American Law Times Reports, vol. 4, p. 205, it was held that "an affidavit by a colored man in a criminal case pending in a State court, setting forth, in substance, that by reason of his color and previous condition of servitude, he could not obtain justice in the courts of his State, entitled him to have his case removed into the United States Circuit Court." In examining this case, it will be observed that the colored man was indicted for murdering a white man as his petition set forth; he also stated in it, that at the time of the alleged homicide, a systematic effort was made by divers persons, members of the democratic party, to produce the impression that the murdered man was killed by the prisoner, and that in killing him he was actuated by political motives; that the officials by whom the jury would be formed, were all democrats; that a colored man was seldom on the jury, which would be composed almost entirely of democrats; and under these circumstances he could not obtain justice in the state courts. It is obvious that the circumstances surrounding this case were exceedingly unfavorable for obtaining a fair and impartial construction of the constitution or law; and it is therefore not surprising that Chief-Justice Pearson decided as he did. But we had a right to expect him, in rendering such a decision, to make some sort of reference to the Constitution of the United States, and not content himself, as he did, with construing the 3d section of the act of Congress of April 9, 1866, which confers exclusive jurisdiction upon

the courts of the United States in all cases, civil and criminal, affecting persons who are denied or *cannot enforce* in the state courts, any of the rights secured by the 1st section of that act, among which is the full and equal benefit of all laws and proceedings for the security of persons and property. Had he examined it, he would have found that the Constitution not only did not authorize the Congress to permit the interference of the Federal courts, because the laws of a state would not be fairly enforced against citizens of the state, because of prejudice, but equally forbid such interference, when the state laws on their face made discriminations against certain of its own citizens; and permitted such interference only when the state laws on their face improperly discriminated against residents of other states, even though they might be sojourning in the state. Such a decision as was rendered by Judge Pearson may be apologized for by referring to the times in which it was rendered, but can never be justified, much less followed. So too in the case of *United States* v. *Rhodes et al.*, decided by the Circuit Court of the United States, for the district of Kentucky, in February 1868, reported in the American Law Times Reports, vol 1, p. 23, Judge Swayne decided that the Civil Rights Law of April 6, 1866, was agreeable to the 13th Amendment of the Constitution of the United States abolishing slavery, and empowering Congress to enforce the same by appropriate legislation; and that Congress had rightfully thereunder given to colored persons, the same right to testify, as is enjoyed by white citizens, and had also given to the courts of the United States jurisdiction of all causes, civil and criminal, which concern the colored man, whenever the right to testify equally with white men is denied him. The judge in this decision did not, like Judge Pearson, omit to take notice of the Constitution of the United States. To reach his conclusions, as the 14th Amendment of the Constitution had not passed, he had first to overrule the decision of the Supreme Court of the United

States in the *Dred Scott Case;* he then had to decide that the words " civil and criminal causes " in the civil rights act did not mean " civil and criminal cases," but causes or matters, out of which cases arose. This construction was necessary, or otherwise he would have had likewise to have overruled the decision of the Supreme Court in *The United States* v. *Ortigu*, 11 Wheat. 467 ; but this nice distinction is overruled by the Supreme Court of the United States, in the case of *Blyew* v. *United States,* 13 Wal. 581; and the decision of Judge Swayne, in *The United States* v. *Rhodes*, which was cited in that case, was expressly overruled; the entire court concurring in this conclusion, excepting only Bradly and Swayne who dissented.   This decision of the circuit court of Kentucky, is worthy of consideration, as one showing in a remarkable degree, the extent to which the judicial mind may be warped by the times and circumstances under which cases are considered.   It was rendered before the passage of the fourteenth amendment.   And it is difficult to conceive how the amendment abolishing the institution of slavery could possibly have been considered as restricting the rights of the States over any freeman.   It left, of course, the rights of freemen exactly where they formerly were, and only declared that all persons should have these rights ; but the power of the States and of the Federal Government over the rights of freemen were not, and could not be affected by the thirteenth amendment; yet it was held in this case, that this thirteenth amendment authorized Congress to pass a law, in effect nullifying a law of Kentucky, whereby colored men could not testify against white persons.   Such laws existed in many States; and no one had ever questioned the right of the Legislatures to pass them.   The Constitution of the United States had in no way prohibited such legislation by the States and all had admitted the right of the States to legislate on this subject as they chose.   The thirteenth amendment conferred no rights on any freeman, and could not

therefore possibly affect the rights of the State to legislate on this subject. And the act of Congress, so far as it interfered with the acknowledged right of the states, was unconstitutional and void. But Judge Swayne held otherwise. He held that the simple abolition of slavery by the Constitution conferred on Congress the right to treat as nullities the laws of the states passed with reference to freemen. If Judge Swayne was right, it was worse than useless to pass the 1st section of the 14th Amendment of the Constitution of the United States; for Congress already had all the powers and greater powers than are conferred on it by this section. Even since the passage of the 14th Amendment, it has been decided that a state has a right to exclude from testifying in its courts, any class of its inhabitants or citizens that it chooses. Thus in California, by statute, Chinese are not permitted to testify for or against white persons; and the supreme court of California has decided that this law is not in violation of the 14th Amendment of the Constitution of the United States: see *People* v. *Brady*, 40 Cal. R., p. 198.

In *Hobbs's case*, decided September 1870 in the District Court of the United States, for the northern district of Georgia, reported in the American Law Times R., vol. 4, p. 190, Judge Erskin held, that a state law prohibiting marriage was not repugnant to the Civil Rights Bill, marriage not being a contract within the meaning of the Civil Rights Act, and he held further, that such a law was not in conflict with the 14th Amendment of the Constitution of the United States, though he gave a much more comprehensive meaning to that amendment, than is given by some of the state courts, and by the Supreme Court of the United States. Thus, in delivering the opinion in that case, he says that the first clause of the 2d section of article 4 of the Constitution of the United States applies to citizens removing from one state to another; while he seems to think that language, which we have seen is in substance the same, and almost in the same

102

*1877.*
Special Term.

State
v.
Strauder.

1877.
Special Term.
_____
State
v.
Strauder.

words, when used in the 14th Amendment has a much broader meaning and includes permanent residents of the state as well as citizens of other states. This view however has been repudiated, not only by the Supreme Court, but by state courts. Thus the same decision, in reference to the constitutionality of a state law prohibiting marriage between white persons and negroes, was made by the supreme court of Indiana, in the *State* v. *Gibson*, 36 Black R. 389, decided in 1871. But this decision is based upon much more satisfactory reasonings. The conclusion reached by that court, after a careful consideration of the whole subject, is that the 14th Amendment of the Constitution of the United States has not in any manner, or to any extent, impaired, weakened or taken away any of the reserved rights of the states, as they had existed and been fully recognised by every department of the national government from its creation; it conferred citizenship upon all persons born in the United States, and subject to their jurisdiction, and it did no more. These views have, to a large extent, met the approval of the Supreme Court of the United States. In the *Slaughter House case*, 16 Wallace 36, the Legislature of Louisana had conferred on The Crescent City Live Stock, Landing and Slaughter House Company certain exclusive privileges, denied to other citizens of Louisiana, which was regarded an oppression and unjust to them, and raised the question: whether since the passage of the 14th Amendment of the Constitution of the United States, "can any exclusive privileges be granted to any of its citizens or to a corporation by the Legislature of a state." It was insisted that such an act was a violation of the 13th Amendment of the Constitution of the United States, as it created "an involuntary servitude." The court, in its opinion, delivered by Justice Miller, says (page 69): "To withdraw the mind from the contemplation of the grand and simple declaration, of the 13th Amendment, of the personal freedom of all the human race within the jurisdiction of this government, and

with a microscopic search, endeavor to find in it a reference to servitudes, which may have been attached to property in certain localities, requires an effort, to say the least. That a personal servitude was meant is proved by the use of the word: 'involuntary,' which can only apply to human beings." - The court deemed it unnecessary to say anything more upon the application of this article of the Constitution to the Louisiana statute; the 13th Amendment of the Constitution, in their judgment, evidently had no bearing on the case. The court, in considering the meaning and effect of the 14th Amendment of the Constitution, says: "That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls and citizens, or subjects of foreign states, born within the United States," page 73; with reference to the next clause, the court says: "The language is, no state shall make or enforce any law that shall abridge the privileges or immunities of citizens of the United States. It is a little remarkable, if this clause was intended as a protection to a citizen of a state against the legislative power of his own state, that the words, 'citizen of the state,' should be left out, when it is so carefully used, and used in contradistinction from 'citizens of the United States,' in the very sentence which precedes it. It is too clear for argument that the change in phraseology was adopted understandingly and with a purpose." The circuit court of Northern Georgia, in the case above cited, seems to have lost sight of what seems so clear to the Supreme Court. The conclusion of the Supreme Court is, that "the privileges and immunities belonging to citizens of a state, as such, must rest for their security and protection where they have heretofore rested; for they are not embraced by this paragraph of the amendment," and again it says: "with very few exceptions, the entire domain of the privileges and immunities of

*1877.*
*Special Term.*

State
v.
Strauder.

1877.
Special Term.

State
v.
Strauder.

citizens of the States lay within the constitutional and legislative power of the States, and without that of the Federal Government. Was it the purpose of the fourteenth amendment, by the simple declaration that no State should make or enforce any law which shall abridge the privileges and immunities of *citizens of the United States* to transfer the security and protection of all the civil rights which we have mentioned, from the States to the Federal Government? And when it is declared that Congress shall have power to enforce that article, was it intended to bring within the power of Congress the entire domain of civil rights heretofore belonging exclusively to the States? All this must follow from the construction insisted upon. Such construction would constitute this Court a perpetual censor upon all legislation of the States on the civil rights of their own citizens, with authority to nullify such as it did not approve as consistent with these rights, as they existed at the time of the adoption of this amendment. The argument, we admit, is not always the most conclusive, which is drawn from the consequences urged against the adoption of a particular construction of an instrument. But when, as in the case before us, these consequences are so serious, so far-reaching and prevailing, so great a departure from the structure and spirit of our institutions; when the effect is to fetter and degrade the State governments by subjecting them to the control of Congress in the exercise of powers heretofore universally conceded to them of the most ordinary and fundamental character; when in fact it radically changes the whole theory of the relations of the State and Federal governments to each other, and of both these governments to the people; the argument has a force that is irresistible, in the absence of language which expresses such a purpose too clearly to admit of doubt."

The next clause of the first section of the fourteenth amendment is: " Nor shall any State deprive any person of life, liberty or property without due process of

law." The court in reference to this says: " this para-

graph has been in the Constitution since the passage of
the fifth amendment, as a restraint upon the Federal
power. It is also to be found in some form of expres-
sion in the Constitutions of nearly all the States, as a re-
straint upon the powers of the States. This law then
has practically been the same as it now is during the
existence of the government, except so far as the pres-
ent amendment may place the restraining power over
the States in this matter in the hands of the Federal
government." It was held by the court that this provision
could in no manner effect the question under considera-
tion.

The only remaining clause in this 1st section of
this 14th Amendment of the Constitution is: "Nor shall
any state deny to any person within its jurisdiction, the
equal protection of the laws."  Upon the true meaning
of this clause, the Supreme Court of the United States,
in the *Slaughter House case,* says but little; they seem
to regard it as obvious that the case before them, the
giving of exclusive privileges to some citizens of a state
by a state law, which was denied to others, was no vio-
lation of this provision; and that its operation and effect
would probably be confined to very few cases; they use
language which implies that it ought probably to be con-
fined to the single case of legislation directed against
negroes as a class. The language used is: "We doubt
very much whether any action of a state, not directed by
way of discrimination against the negroes as a class, or
on account of their race, will ever be held to come with-
in the purview of this provision. It is so clear a provi-
sion for that case and that emergency, that a strong case
would be necessary for its application to any other. But
as it is a State that is to be dealt with, and not alone the
validity of its laws, we may safely leave the matter until
Congress shall have exercised its power, or some case of
state oppression, by denial of equal justice in its courts,
shall have claimed a decision at our hands." I can see

no reason why the court should have considered that under this provision of this Amendment, "it was a State that was to be dealt with, and not alone the validity of its laws," any more than under the preceding paragraph, which provides that, "no State shall deprive any person of life liberty or property, without due process of law," or any more than under numerous other provisions of the Constitution, such as those contained in the 10th section of article 1, where it is said no State shall do a number of things enumerated—all these restrictions on the powers of the state have, so far as I know, been enforced simply by regarding acts, done in violation of these provisions, nullities; and I see no reason why the provisions of the 14th Amendment of the Constitution should not be so construed and enforced. Again, the court seems to think a much stronger case of unjust discrimination by a State against any class of its inhabitants, such as Chinese, Catholics, Mormons, naturalized foreigners or women, would be required to be made out, before a case could come within the purview of this provision in the fourteenth amendment, than would have to be made out if the discrimination were against negroes. I can not believe that the States, which adopted this amendment, designed thereby to secure to the negroes any rights or privileges, that were not equally secured to all others. It is true that the occasion for this provision and all the other provisions of the thirteenth and fourteenth amendments was the supposed necessity of protecting the negro ; but special care was taken to extend these provisions to all persons whatsoever. The language is as broad as it possibly can be : "No person shall be denied the equal protection of the laws." A Chinaman or a naturalized foreigner or Roman Catholic is obviously under this provision entitled to this equal protection of the laws to the same extent as a negro ; and though the Supreme Court has used this language, I can not believe, when the case arises, that they can, or will, in any decision they may render discriminate

against others in favor of the negro. If they had held the law of Kentucky, forbidding a negro to testify for or against a white person, unconstitutional, they would assuredly have held the law of California, prohibiting a Chinese to testify for or against a white person, also unconstitutional. From the general tenor of the decisions of the Supreme Court, it is fair to conclude that they regard the position taken by the supreme court of Indiana, if not entirely sound, as substantially so; and that the thirteenth and fourteenth Amendments of the Constitution of the United States have little or no other effect, than to abolish slavery and declare a negro a citizen, when born in the United States; and that the powers of the State Legislatures over the civil rights, privileges, duties, or immunities of any and all of its citizens, whether negroes or whites, remain as they always were; and that no power with reference to these rights is conferred by Congress on the Federal judiciary. This decision of the Supreme Court has since been followed up by others, based on the same views of the meaning of these Amendments of the Constitution. Thus in *Bradwell* v. *The State*, 16 Wall. 130, the court decided that the decision of the supreme court of Illinois, that a woman resident in Illinois ought to be refused a license to practise law in the courts of that state, by the law of that state, was no violation of the 14th Amendment of the Constitution of the United States, basing that decision on the broad ground that, no matter what laws a state may pass relative to its own citizens, their rights or immunities, such law would not violate this amendment of the Constitution; and on these principles, any state could prohibit a Chinese or a negro, or a white man, resident in the state, from practicing law or sitting on a jury, or giving evidence in its state courts. In the same spirit, the 3d and 4th sections of the act of May 31, 1870 (16 Stat. 140), providing for the punishment of state officers of election and others, was pronounced unconstitutional by the

Supreme Court, in the case of the *United States* v. *Reese et al.*, 2 Otto p. 215, the same not being regarded as "appropriate legislation," within the meaning of the fifteenth Amendment of the Constitution. And in the *United States* v. *Cruikshank*, 2 Otto R. 542, the Supreme Court decided that the fourteenth Amendment of the Constitution of the United States prohibits a state from depriving any person of life liberty or property, without due process of law, and from denying to any person within its jurisdiction the equal protection of the laws; but it adds nothing to the rights of one citizen against another. It simply furnishes an additional guaranty against the encroachment by the states upon the fundamental rights, which belong to every citizen as a member of society. The duty of protecting all its citizens in the enjoyment of an equality of rights was originally assumed by the states, and it still remains there.

I will follow the example of the Supreme Court of the United States in the *Slaughter House cases*, 16 Wal. 81, and not undertake to state my views of the cases, to which the last clause of the first section of the fourteenth amendment may apply, till some case arises of oppression by the State, by the denying of equal protection of the laws to some person within its jurisdiction; and content myself, as they did, with saying that we find no such case in the one before us. For this is obviously no such case. The prisoner has not been denied the equal protection of the laws of West Virginia. It follows from the case of *Blyew* v. *The United States*, 13 Wal. 581, that in the opinion of the Supreme Court, the prisoner could not be regarded as being denied the equal protection of the laws, if white persons had been, as they were, permitted to testify against him, even if our State laws had prohibited, which they do not, a negro to testify in an exactly similar case against a white prisoner on trial. And surely if this be the case, the mere prohibition of negroes to sit upon the jury which tried him can not be regarded as the denial of

equal protection of the laws to him. The negro has no more right to insist upon the equal protection of the laws, than a Chinaman or a woman. And surely it will not be pretended that a State, which by its laws, prohibits a Chinaman or a woman from sitting on a jury, does thereby deny to a Chinaman or woman, who is being tried for a felony the equal protection of the laws. Has not a woman as much right to insist that a State, by its laws, must permit her to be defended by a woman as her counsel, as she has to insist that women should be allowed to sit on a jury which tries her. And yet the Supreme Court of the United States decided in the case of *Bradwell* v. *The State*, 16 Wall. 130, that a State has a right to prohibit women from acting as counsel in any case. I agree with the Supreme Court in the *Slaughter House cases*, that it is doubtful whether in the future, any action of a State is likely to occur, which will ever be held to come within the purview of this last clause of the 1st section of the 14th Amendment, prohibiting a state to deny to any person the equal protection of its laws. But I cannot think that a state is likely to bring a case within the purview of this provision, by discriminating against the negro in such manner as to deny to the negro the equal protectiod of the laws, as it has been heretofore interpreted. And as I have before said, I believe the interpretation of this provision ought and must be the same, whether applied to negroes, Chinamen, women or other persons. I know of no state law which has been passed since the adoption of this Amendment of the Constitution which violates it by thus discriminating against negroes; and though there have been some state laws, even in our own state, which would perhaps be regarded as violating this provision of the Constitution of the United States, yet they were directed not against negroes but against white persons. They have however been repealed, and it is not likely that such acts will ever be again passed by any state. It is confidently believed that no such acts

103

will be ever again enacted in this State. An example of this sort of legislation may be found in the act passed February 28, 1865, and re-enacted in the Code of West Virginia of 1868; see Code of West Virginia, chapter 136, sections 10, 11, 12 and 13, page 645. This act prohibited any person who had abetted the Confederate States from suing a person who had remained loyal to the government of the United States.

The views I have expressed show clearly, that in the case before us, the circuit court did not err in refusing to order the removal of this case to the United States Court for trial. The prisoner in his petition based his application for such removal on two grounds : first, because a false impression prevailed throughout the State of West Virginia, that colored men are not entitled to the same protection in the marital relation as white men. This amounts to an allegation that prejudices exist in this State relative to negroes, that would injuriously affect him, if he were tried before the State courts. It is obvious from what has been said, that in my opinion this gives him no right to have the trial of his case removed to the Federal court. If it did, any citizen of this State, white or black, could at his pleasure on affidavit remove any case, civil or criminal, from the State to the Federal courts. The other ground, alleged in the petition for the removal of the cause to the Federal court, is that under the laws of West Virginia none but white persons are allowed to serve as jurors, and therefore he being a negro has not the equal protection of the laws. We have seen that in the trial of a citizen of this State for an offense committed in the State against her laws, the prisoner could in no case have a right to have the trial removed to the Federal court; the fourteenth amendment not being intended to protect the citizens of any State against unjust legislation by their own State. In the particular case before us, I can not see why a jury of white men would not be quite as likely to do justice to the prisoner as a jury of negroes; but if it were otherwise, it would

give him no right to have his case removed to the Federal court for trial.

The third error assigned is, that "the circuit court ought to have quashed the *venire facias*, issued for the trial of the cause, on the motion of the defendant." The *venire facias* was a summons, issued by the clerk of the court, directing the sheriff to summon thirty good and lawful men, duly qualified to serve as jurors, to be and appear before the court on October 14, 1874, to serve during the term as jurors for the trial of causes, unless sooner discharged. It was dated September 18, 1874, and was accompanied by a certificate of a list of thirty jurors, drawn by the clerk of the county court, on the 18th day of September 1874, to serve at the October term 1874 of the circuit court, which certificate was signed by the clerk of the county court, Robert B. Woods, and witnessed by him in his official capacity. And the summons was returned by the sheriff, executed by summoning twenty-eight of the jurors, whose names are given, and returning the other two as non-inhabitants, the return being dated October 12, 1874. It is insisted by the prisoner that this summons was irregular, that the 3d section of chapter 47 of the acts of 1872-3, p. 703, provides how a *venire facias* should have been issued, and that these directions have not been pursued; and that under this section the *venire facias* should have been issued for the trial of this case specially, and not for the trial of causes generally. It is unnecessary to consider how a *venire facias* for the trial of a felony case, under this section, should be issued, as it is obvious from the face of the record in this case, as set forth in the third bill of exceptions, that this summons was not issued under this third section. The 6th section of said act provides, that should the county court choose, another and different mode of summoning juries for the trial of criminal and civil causes in the courts of the county might be resorted to. The mode, thus prescribed, requires the county court to prepare a list of persons qualified as jur-

ors, whose names are placed in a box, from which are to be drawn, at least twenty days before the term of any court, the names of thirty jurors, and that the list should be given to the sheriff who has in hand the summons or *venire facias.* The mode of doing this is given in great detail in said act. The record shows that this mode of obtaining the jury was resorted to in this case. The summons or *venire facias* is pursuant to the 11th section of the act. The certificate of the county clerk shows that the jurors were drawn, and the list was furnished the sheriff, as provided for in the 15th section of the act; and it was returned pursuant to the 14th section of the act. The face of the record shows no irregularity in the *venire facias,* or in its return. It is true no proof was offered to show, that all of the provisions of this act for summoning a jury had been complied with by the county court, or the various officers on whom duties in connection therewith were devolved by said act. But this was clearly unnecessary. It will be presumed that all these details have been properly pursued, unless the prisoner making the objection to the *venire facias* shows, that they have been violated to his injury in some respect. In the present case he has failed to show, that they have not been fully complied with; and so far as the record speaks on the subject, they seem to have been complied with; and when it is silent it must be presumed that the provisions of the law have been obeyed.

The fifth error assigned was the failure of the court to quash the panel of jurors on his challenge of the array for reasons set forth in the fourth bill of exceptions; but no reasons were assigned for quashing the panel except those already considered by me; and they were, as I have shown, insufficient.

The sixth error assigned is: "that the court should have withdrawn the juror, Edward Larkin, after the discovery of his incompetency." The facts, on which this assignment of error is based, are set forth in the fifth

bill of exceptions. The facts are, that after the jury had been examined on their *voir dire*, accepted and sworn, and after considerable testimony had been taken, on the third day of the trial, the prisoner's counsel showed to the Judge privately the affidavit of one James A. Robinson, that about the first of August 1874, Edwin Larkin, one of the jurors, in passing his place of business, asked him what ought to be done with Strauder? That affiant replied, he did not care what was done with him; and asked him (Larkin) what he thought; he replied in positive terms: he killed his wife and should be hung for it; also Taylor Strauder's affidavit and that of his counsel, that they had just learned, that Edward Larkin had expressed any opinion, or had any bias in the case.

The court further certified that the prisoner and his counsel made no motion based upon said affidavits, or looking to any action on the part of the court, relating to said juror; and the court took no action and allowed the trial to proceed without any objection formally made on the part of the prisoner. And after the jury had returned their verdict, the prisoner moved the court to set aside the verdict and grant him a new trial, in part because Larkin was an incompetent or improper juror, when the attorney for the commonwealth submitted the counter affidavit of Larkin, and the court refused the new trial. This counter affidavit was that he did not on the occasion referred to, or on any other occasion, say to Robinson, or any one else, that Taylor Strauder had killed his wife and should be hung, or words to that effect; but on the contrary, he had never entertained any prejudice or bias towards Taylor Strauder.

I am clearly of opinion, that the court did not err in its action in this matter. If neither the prisoner nor his counsel had ever heard of Larkin having expressed an opinion, till after the verdict, it is clear, upon the authority of *The State* v. *McDonald*, 9 W. Va. 456, that the court ought not to have granted the prisoner a new trial on the facts above stated. In

*1877.
Special Term.*

State
v.
Strauder.

that case, one of the jurors had sat upon the grand jury that indicted McDonald. On his *voir dire,* he stated that he had not made up or expressed an opinion as to the guilt or innocence of prisoner, and that he had not been a member of the grand jury who found the indictment against the prisoner. The prisoner and his counsel discovered after the verdict, that this juror had been upon the grand jury. The state made no effort to explain why the juror had so acted and sworn; yet this court, after a careful review of the Virginia authorities on the subject, sustained the judgment of the circuit court in refusing to grant a new trial, under these circumstances; the prisoner failing to show that he suffered injustice from the fact that the juror served upon the jury. In this case the record fails to show that the prisoner suffered injustice from Larkin being on the jury; and the facts shown are far weaker for the prisoner than those shown in McDonald's case. I am further of opinion that the case of the defendant is weakened, rather than strengthened, by the fact that he was aware of the statement, that Robinson would make, before the case was submitted to the jury, and made no formal motion to the court to exclude him from the jury. It was not the duty of the court to act upon the *ex parte* affidavits shown it, without any motion and without affording the attorney for the commonwealth an opportunity to contradict them; and the prisoner having made no motion to exclude Larkin from the jury, he cannot be heard to complain of his having served after the rendition of the verdict.

The next error assigned is, that the court erred in refusing the instruction asked for by the prisoner, and giving the instruction it did in lieu thereof to the jury. The instruction asked by the prisoner's counsel and refused by the court was: " If the jury entertain a rational doubt as to the soundness of the mind of the prisoner at the time of the commission of the homicide charged, he is entitled to the benefit of that doubt, as he would be to the benefit of a doubt as to any other material fact in the

case (it being under our statute a necessary ingredient of the offense, that the person charged shall, at the time of the commission of the offense, be of sound mind) although the jury may believe he had judgment and reason sufficient to discriminate between right and wrong in the ordinary affairs of life, even at the time of the commission of the offense, they cannot find him guilty." And the instruction given in lieu thereof by the court was : " To entitle the prisoner to an acquittal upon the ground that he was insane at the time of the commission of the offense charged in the indictment; such insanity must be proven to the satisfaction of the jury, though in passing upon this question, they may look at the whole evidence in the cause, as well that for the State as the prisoner." The instruction as given by the court is in almost the words of Judge Moncure in delivering the opinion of the court in *Boswell's case,* 20 Gratt. 875. There is unquestionably respectable authority to the effect, that all the proof, required to repel the presumption of sanity is only so much as would raise a rational doubt of the sanity of the prisoner at the time of committing the act charged upon him : See *People* v. *Mc-Cann,* 16 N. Y. 58; *Ogleton* v. *State,* 28 Ala. 692; *State* v. *Bartlett,* 43 N. H. 224; *Polk* v. *State,* 19 Ind. 170; *Hopps* v. *State,* 31 Ill. 385; also *Chase* v. *People,* 40 Ill. 358. But on the other hand the weight of authority, English and American, is that insanity must be proven to the satisfaction of the jury, to entitle the prisoner to an acquittal; and that it is not sufficient that the evidence raises a rational doubt of the prisoner's sanity at the time he committed the offense, &c. See *Rex* v. *Stokes,* 3 C. & K. 138; *Rex* v. *Taylor,* 4 Cox C. C. 155; *State* v. *Bringer,* 5 Ala. R. 244; *State* v. *Stark,* 1 Strobh. R. 479; *State* v. *Hutting,* 6 Benn. R. 474; *State* v. *Starling,* 6 Jones's R. C. R. 471; *State* v. *Spencer,* 1 Zabr. R. 202; *State* v. *Bonfunt,* 3 Menn. R. 123; *State* v. *Brandon,* 8 Jones N. C. R. 463; *People* v. *Myers,* 20 Cal. R. 518; *Com.* v. *Eddy,* 7 Gray R. 583; *Com.* v.

*Rogers*, 7 Met. R. 500.   Moncure, President, in delivering the opinion of the court in *Boswell's case*, 20 Gratt. 875, cites all these cases, and after reviewing them, concludes, that "insanity, when relied on as a defense to a charge of crime, must be proven to the satisfaction of the jury, to entitle the accused to an acquittal on that ground ; though such proof may be furnished by evidence introduced by the commonwealth to sustain the charge, as well as by evidence introduced by the accused to sustain the defence."   This conclusion is, I think, sustained not only by the weight of authority, but also by sound reason.   When the state proves the *corpus delicti*, and that the act was done by the accused, it has made out its case.   And if the prisoner relies on the defense of insanity, he must prove it to the satisfaction of the jury. This rule is necessary to protect the public interests, and is just to the accused.   I think therefore the circuit court did not err in refusing the prisoner's instruction, and in giving the instruction it did in lieu thereof.

The last error assigned is : the refusal of the court to grant a new trial, or arrest the judgment on the motion of the defendant.   All the grounds upon which such motions could be based have been reviewed already and found insufficient, except upon the ground alleged that the evidence was insufficient to justify the verdict.   It is unnecessary to review this testimony ; it is sufficiently set forth in the statement of the case, to show its general character, and the material facts on which the jury found their verdict.   I will however note a few of the most prominent facts, which tend to show the degree of the murder.   The evidence shows, that, however annoying the conduct of his wife may have been, he was, as proven by prisoner's witness, entirely reconciled to her two days before he killed her.   They were then seen sitting together for some time on the porch of his house ; in the language of the witness, "they were sitting there very lovin', they were acting very nice and very well together.   She was trying to learn him to read."   The

night preceding her killing, though jeered by his acquaintance on account of the want of chastity of his wife, in disgustingly coarse language, he apparently took no offense at it, showing no anger and remaining, where he was liable to be thus jeered, a considerable time after the jeering commenced.. He went to his home about half-past eleven o'clock at night; on his way there he neither in his manner nor by his conversation showed, that the jeering of him by his acquaintances had either angered him or seriously annoyed him. He seems to have become so accustomed to it, that it annoyed him much less than it had done, when it commenced some months before. On entering his house, he saw, or thought he saw, a white man pass out of the back door. He charged his wife with being with this man; she denied that any man was there ; they wrangled about it during the night. In the morning they got up, and she was sitting in a chair lacing her shoe, when he again charged her with having been with this man, which she denied; we do not know exactly what he said, or what she said in reply ; but whatever it was, it so provoked him, that he took up a hatchet and struck her on the head two severe blows, of which she died in probably less than an hour.

The evidence did not even raise a rational doubt of his sanity. And the verdict of the jury that he was guilty of murder in the first decree, was justified by the evidence. The circuit court properly overruled the motion for a new trial, and the motion in arrest of judgment.

The judgment of the circuit court pronounced on January 7, 1875, that Taylor Strauder be hanged, must for these reasons be affirmed.

JUDGES HAYMOND, MOORE and JOHNSON concurred.

JUDGMENT AFFIRMED.